STATE of Missouri, Respondent,

v.

Randy T. BARKS, Appellant.

No. SC 85735.

Supreme Court of Missouri,
En Banc.

March 9, 2004.

John M. Albright, Stephen E. Walsh, Poplar Bluff, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Andrea M. Follett, Asst. Atty. Gen., Jefferson City, for respondent.

## PER CURIAM.[1]

Randy T. Barks was convicted of the class C felony of possession of methamphetamine, a controlled substance. Sec-

tion 195.202.[2] The judgment is reversed, and the case is remanded.

Barks was driving a Dodge pickup westbound. A highway patrolman was driving in the opposite direction. Radar equipment in the patrolman's vehicle recorded Barks' speed at 74 miles per hour. The speed limit was 55 miles per hour.

The patrolman activated the emergency equipment on his car and pursued Barks. Barks stopped and was outside his pickup when the patrol car stopped. The patrolman told Barks the reason he was stopped and asked Barks for his driver's license and proof of insurance. Barks produced his driver's license and told the patrolman he thought the insurance card was in the pickup. The patrolman followed Barks back to Barks' vehicle where he retrieved the insurance card. The patrolman told Barks he was going to issue Barks a citation. The patrolman asked Barks to stay in his vehicle while the patrolman returned to the patrol car.

When he got in his patrol car, the patrolman "[r]an an operator check" to determine if Barks' license was valid and wrote Barks a speeding ticket. After writing the ticket, the patrolman returned to Barks' vehicle. The patrolman explained, "I gave the citation and a—I believe a copy of the mail-in and the driver's license back to [Barks]. I explained to him the different options he had on taking care of the citations [sic] where he could either take care of it through the mail or he could appear in person if he wanted to plead not guilty."

The patrolman was asked if Barks had any questions for him. He answered, "Not that I recall." The patrolman observed

---

**1.** This Court transferred this case after an opinion by the Court of Appeals, Southern District, authored by the Honorable John E. Parrish. *Mo. Const. article V, section 10.*

Portions of the court of appeals opinion are incorporated without further attribution.

**2.** All statutory citations are to RSMo 2000.

that Barks appeared nervous. He commented on Barks' nervousness and asked if there was a problem or if there was a reason for his nervousness. The patrolman testified that Barks said that his wife had called him or he had contacted his wife, that a small child was sick, and that he was in a hurry to get home.

The patrolman asked Barks if he had anything illegal, such as weapons, drugs, or contraband in his vehicle. Barks replied that he did not. The patrolman thought Barks appeared uncomfortable when he asked him whether he had anything illegal. He asked the same question again. The patrolman was asked what response Barks made. He answered, "At that time, like I said, again, I could visually see him getting more nervous. I could see his heart beating inside of his shirt. He was beginning to act fidgety and he did reply yes, that he did have a weapon in the vehicle."

The patrolman asked permission to retrieve the weapon from where he had been told it was located, in the back seat area of Barks' pickup. Barks gave permission to get the weapon. The patrolman asked Barks to get out of his vehicle, then reached behind the driver's seat and located a pistol between the two seats underneath some newspapers. He then asked Barks to sit in the patrol car while he checked to see if the gun was stolen. He learned it was not.

The patrolman was asked what occurred while he and Barks were in his patrol car. He was asked the following questions and gave the following answers:

Q. Okay. And what happened then?

A. While running the wanted check on the pistol I had conversation with [Barks] and at that time asked him for consent to search the vehicle.

Q. Okay. Consent to search the vehicle—the truck?

A. Correct.

Q. Okay. Did [Barks] reply?

A. At that time he mumbled something, but I was unable to understand what his mumble was.

Q. So did you inquire again?

A. Yes, I asked a second time.

Q. And what did [Barks] say?

A. [Barks] advised he would if the vehicle was his; however, the vehicle did not belong to him, I believe it belonged to his father, and he didn't think he had the right to let me search something that wasn't his.

Q. Okay. So did you inquire further?

A. I asked if I could search his person and he replied yes, that I could.

. . .

Q. And what did you do then?

A. I asked [Barks] to exit my patrol car and step in front of my patrol car between my patrol car and his Dodge pickup.

Q. Okay. And did you make a request of [Barks] after you had him outside of the patrol car?

A. Yes, sir.

Q. And what was that request?

A. I asked [Barks] if he'd empty his pockets for me.

Q. Okay. In fact, did [Barks] comply with that request?

A. To some sort, yes.

Q. Okay. What do you mean by to some sort?

A. He emptied all his pockets except for his shirt pocket.

Q. Okay. And how do you know that he didn't empty his shirt pocket?

A. I could visually see an item inside of his shirt pocket.

Q. So what did you do then?

A. I'm sorry—I could visually see an item protruding through the shirt pocket.

Q. Okay. So what did you do then?

A. I asked [Barks] what the item was.

Q. Did he reply?

A. Yes. He replied something to the fact that it was, like, a cigarette pack or empty cigarette pack.

Q. So what did you do?

A. I reached in his pocket and removed the item.

The patrolman said the item he removed was a cigarette pack and some tinfoil. The patrolman said his experience was that tinfoil like that he removed was commonly used in the smoking of methamphetamine. Barks was arrested for possession of drug paraphernalia. Laboratory analysis revealed that the tinfoil had traces of methamphetamine on it.

Barks was handcuffed, placed in the patrol car, and read his *Miranda* rights.[3] The patrolman asked Barks if he was hiding anything in the vehicle. Barks told the patrolman there was a glass bowl in the truck. The patrolman found a "glass smoking bowl" in the center console of the pickup. He also found several more pieces of burned tinfoil, a second cigarette pack containing burned tinfoil, and a rolled bill (thought to be a dollar bill) with tin outside the bill. He found a coffee filter in the center console. There were two plastic bags in the rear seat of the pickup that contained pseudoephedrine tablets. The items seized by the patrolman were admitted in evidence as State's Exhibits 1 through 6.[4]

Barks' only point on appeal is that the trial court erred in overruling his objection to the introduction in evidence of exhibits taken after the patrolman wrote and delivered the speeding citation to Barks and returned Barks' driver's license. He contends the admission in evidence of the items the patrolman seized was error because he was detained "after the lawful purpose of the traffic stop had concluded." He further contends that the seizure of the item from Barks' shirt pocket and subsequent search of his truck exceeded the scope of consent Barks had given to search his person. The first issue is dispositive.

The Fourth Amendment to the United States Constitution guarantees the right of all citizens to be free from unreasonable searches and seizures. U.S. Const. amend. IV. A routine traffic stop based on the violation of state traffic laws is a justifiable seizure under the Fourth Amendment. *State v. Slavin,* 944 S.W.2d 314, 317 (Mo.App.1997). "[S]o long as the police are doing no more than they are legally permitted and objectively authorized to do, [the resulting stop or] arrest is constitutional." *Id.; accord, State v. Malaney,* 871 S.W.2d 634, 637 (Mo.App.1994), *quoting, United States v. Trigg,* 878 F.2d 1037, 1041 (7th Cir.1989).

The fact that the police may detain a person for a routine traffic stop does not justify indefinite detention, however. The detention may only last for the time necessary for the officer to conduct a reasonable investigation of the traffic violation.... *State v. Woolfolk,* 3 S.W.3d 823, 828 (Mo. App.1999).

---

**3.** *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**4.** Ex. 1 was a black pistol case with Ruger pistol. Ex. 2 was two ammunition magazines and a speed loader. Ex. 3 was ammunition.

Ex. 4 was a bag with tinfoil, 2 cigarette packages, a coffee filter and glass bowl. Ex. 5 was a bag with pseudoephedrine tablets. Ex. 6 was a bag with pseudoephedrine tablets.

A reasonable investigation of a traffic violation may include "asking for the driver's license and registration, requesting the driver to sit in the patrol car, and asking the driver about his destination and purpose." *State v. McNaughton*, 924 S.W.2d 517, 523 (Mo.App.1996); *United States v. Ramos*, 42 F.3d 1160, 1163 (8th Cir.1994). *See also State v. Slavin*, 944 S.W.2d 314, 318 (Mo.App.1997). The circumstances that resulted in the charge for which Barks was convicted occurred after the patrolman completed his investigation of the traffic stop and issued Barks a traffic citation for speeding. Barks had remained in his pickup at the direction of the patrolman while the patrolman checked the validity of Barks' driver's license. The patrolman returned to the pickup and stood outside the driver's window looking down at Barks during the inquiry that followed issuance of the traffic citation. Once the issuance of the traffic citation was completed, Barks should have been permitted to go absent the patrolman having had an objectively reasonable suspicion that Barks was involved in criminal activity based on specific, articulable facts. *Id.* "[T]he basis for the reasonable suspicion must arise within the parameters of the traffic stop itself; suspicions based upon answers to questions asked after the stop is completed are irrelevant to the determination of whether specific, articulable facts supported a reasonable suspicion of criminal activity and provided a justification for further questioning once the traffic stop was completed." *Woolfolk*, 3 S.W.3d at 829.

Here, as in *Woolfolk*, the initial traffic stop was completed once the officer returned to the vehicle he had stopped and returned the driver's license and insurance card. There is no evidence that the patrolman had developed articulable facts that would have supported a reasonable suspicion of criminal activity justifying detention of Barks for further inquiry. Although the patrolman testified that Barks appeared nervous, that alone does not give rise to reasonable suspicion. *Id.*

The state attempts to justify the patrolman's actions on the basis that the conversation that followed the traffic stop was voluntary; that the mere fact that a law enforcement officer talks with someone or asks a question does not mean the person is seized or detained. *Woolfolk* explains, "So long as the person is free to leave, the officer can talk to him, and is free to ask whether he has contraband on his person, or in his car, or in his residence." 3 S.W.3d at 830. *Woolfolk* admonishes, nevertheless, that "[t]his does not mean ... that an officer is free to involuntarily detain a driver without reasonable suspicion under the guise of simply engaging in a voluntary conversation." *Id.*

During the interrogation that occurred after the patrolman had written the traffic citation, the patrolman positioned himself by Barks' window on the driver's side of the pickup where Barks was seated, looking down at Barks. The emergency lights on the patrol car remained activated. Although the patrolman testified that Barks could have driven away after he issued the traffic citation and began asking questions, that option was not apparent from the circumstances. The patrolman did not tell Barks he was free to go. Barks testified at the offer of proof in support of his motion to suppress evidence that he never felt like he could have driven away. The conversation the patrolman maintained with Barks was constant. Considering the totality of the circumstances, a reasonable person in Barks' position would have understood the situation to be one of custody. *See State v. Werner*, 9 S.W.3d 590, 595

(Mo. banc 2000). Barks' belief that he was in custody was warranted.

Barks' claim that the trial court erred in admitting the evidence obtained following completion of the traffic stop is well taken. The evidence was obtained by exploitation of the illegality of Barks' detention. *See State v. Mosby,* 94 S.W.3d 410, 419 n. 7 (Mo.App.2003). The trial court's admission of the evidence was an abuse of discretion. *See State v. Taylor,* 61 S.W.3d 319, 322 (Mo.App.2001). Without the illegally obtained evidence, there is insufficient evidence to convict Barks. However, the erroneous admission of evidence does not preclude retrial because the state may produce other evidence that cures the evidentiary insufficiency. *State v. Kinkead,* 983 S.W.2d 518, 519 (Mo. banc 1998).

The judgment is reversed, and the case is remanded.

All concur.