STATE of Missouri, Respondent,

v.

Oscar Barreras SANCHEZ a/k/a Antonio Lopez, Appellant.

No. WD 63807.

Missouri Court of Appeals, Western District.

July 26, 2005.

Cause Ordered Transferred Aug. 30, 2005.

Case Retransferred Dec. 20, 2005.

Court of Appeals Opinion Readopted Dec. 27, 2005.

---

All statutory references are to RSMo. (2000)    unless otherwise indicated.

Margaret Mueller Johnston, Columbia, MO, for appellant.

Richard Sharnes, Assistant Attorney General, Jefferson City, MO, for respondent.

Before BRECKENRIDGE, P.J., LOWENSTEIN and HARDWICK, JJ.

PATRICIA BRECKENRIDGE, Judge.

Oscar Sanchez appeals his conviction and sentence for the class A felony of trafficking in the first degree, under section 195.222, RSMo Cum.Supp.2004, and the class C felony of possession of a controlled substance, under section 195.202, RSMo 2000. On appeal, Mr. Sanchez asserts that the trial court clearly erred in denying his motion to suppress and in considering evidence seized during a search of a vehicle in which he was riding because the search was conducted without reasonable suspicion that he was engaged in criminal activity. Because this court finds the detention extended beyond the time reasonably necessary to effect the purpose of the initial traffic stop and there was no new reasonable suspicion that would support further detention, the judgment is reversed and the case is remanded.

### Factual and Procedural Background

On July 5, 2003, Missouri State Highway Patrol Trooper Russell Seaton and Highway Patrol Corporal Gary Swartz were parked on the shoulder of Interstate 70 in Saline County. Trooper Seaton was out of his patrol car when he noticed a white Pontiac Grand Am with Montana license plates drive by. Tara Hencz was driving the car and Mr. Sanchez was a passenger. After the car passed by, Trooper Seaton returned to his patrol car and proceeded down the interstate. Although he was not pursuing the Grand Am, he eventually caught up to the car, which was traveling about sixty-eight or sixty-nine miles per hour. At that time, he noticed that it was following a tractor-trailer too closely. After Trooper Seaton observed the car following the tractor-trailer for more than a quarter of a mile, he activated his emergency lights and stopped the car for following too closely.

Trooper Seaton approached the car on the passenger's side and spoke with Ms. Hencz, the driver. He asked her to produce her driver's license and proof of insurance. When handing Trooper Seaton her Montana driver's license, insurance, and registration paperwork, Ms. Hencz appeared to be very nervous and her hands were visibly shaking. Trooper Seaton asked Ms. Hencz to step back to the rear of the car. He then asked her questions about the purpose of her trip and about her passenger, Mr. Sanchez. Ms. Hencz said she was traveling to St. Louis to visit her aunt and identified Mr. Sanchez as

"[m]y friend Anthony." She told Trooper Seaton she did not know Mr. Sanchez's last name and did not know where her aunt lived in St. Louis. Ms. Hencz's nervousness increased as Trooper Seaton continued to question her.

Trooper Seaton returned to the passenger side of the car and asked Mr. Sanchez some questions. Mr. Sanchez said that his name was Antonio Lopez, Ms. Hencz was his girlfriend, and they were going to St. Louis to see a friend. Mr. Sanchez also told Trooper Seaton that he did not know where in St. Louis they were going. When asked for identification, Mr. Sanchez handed Trooper Seaton an "Arizona identification card." Trooper Seaton immediately became suspicious that the card was a fake because of its unevenly placed picture, typeset, unusual lamination, uneven rounded edges, and lack of a holograph.

After questioning Mr. Sanchez, Trooper Seaton took Ms. Hencz back to Trooper Seaton's patrol car. Trooper Seaton ran a computer check on Ms. Hencz's driver's license and Mr. Sanchez's identification card. While he was doing this, Trooper Seaton continued to ask Ms. Hencz questions about her trip. She was evasive in answering questions and indicated she had not spoken to her aunt in several days. She said her aunt's phone number was somewhere in the car. She also said she and Mr. Sanchez were just friends. Trooper Seaton noticed that Ms. Hencz's level of nervousness continued to increase and he could see her pulse beating in her abdomen. At this point, Trooper Seaton contacted Corporal Swartz for backup.

After Corporal Swartz arrived, Trooper Seaton advised him of the inconsistent stories given by Ms. Hencz and Mr. Sanchez and showed him Mr. Sanchez's identification card. Corporal Swartz also believed the card was a fake. The two officers talked briefly to Ms. Hencz and, then,

Corporal Swartz went to speak to Mr. Sanchez. Mr. Sanchez told Corporal Swartz he had been living in Montana for five months, Ms. Hencz was his girlfriend, and he had been staying with Ms. Hencz. He said that Ms. Hencz "tended bar." He also told Corporal Swartz they had been in Kansas City, they had gone to Oceans of Fun, and they were on their way to St. Louis.

Corporal Swartz then spoke to Ms. Hencz. She told him that she was a housekeeper. She said that Mr. Sanchez had only been in Montana for one or two weeks and he lived in a hotel. As the officers continued to question Ms. Hencz, she grew more nervous, became very rigid and tense, and started to hug herself.

Eventually, Trooper Seaton received confirmation that the vehicle was properly registered, Ms. Hencz had a valid driver's license, and the information contained on the identification card was on file. Trooper Seaton entered a warning for Ms. Hencz for following too closely, handed her paperwork back to her, and said, "Have a safe trip, you're free to go." At this point, it had been approximately thirty-five to forty minutes since Trooper Seaton initially stopped Ms. Hencz.

Although Trooper Seaton told Ms. Hencz that she was free to go, he had no intention of releasing the Grand Am automobile. He believed he was entitled to detain the vehicle because he had articulable facts to support a reasonable suspicion that criminal activity was occurring. Specifically, his suspicions were aroused by Ms. Hencz's failure to know Mr. Sanchez's name and the fact that neither Ms. Hencz nor Mr. Sanchez could provide a solid location where they were going. He also took into account the discrepancies between statements from Ms. Hencz and Mr. Sanchez, such as the nature of their relationship, where Mr. Sanchez lived in Montana,

how long he had been in Montana, what Ms. Hencz did for a living, and what they had done in Kansas City. He also considered that Ms. Hencz and Mr. Sanchez were traveling eastbound on Interstate 70, which is "a known and documented established drug thoroughfare," and were headed to St. Louis, "which is a known destination ... city for narcotics." He also was concerned that Ms. Hencz was abnormally nervous during the traffic stop, and she became more nervous as the stop continued. Under the totality of these circumstances, he suspected drug smuggling.

After Trooper Seaton told Ms. Hencz that she was free to go, she got out of the patrol car and began to walk back to her car. As soon as Ms. Hencz got to the rear of her car, Trooper Seaton got out of his patrol car and asked her if he could ask her a few more questions. She agreed and returned to the front of the patrol car. Trooper Seaton asked her if she knew of the drug problem in the country. She indicated that she did. At this point, Trooper Seaton noticed that Ms. Hencz became visibly shaken and she was breaking out in goose bumps, even though it was over one hundred degrees outside. He then asked her if she knew that people transported drugs across the country everyday in all types of vehicles. She said that she did not. Trooper Seaton told Ms. Hencz that he was not accusing her of any wrongdoing, but he was suspicious. He asked Ms. Hencz for consent to search her car. She refused. Trooper Seaton then asked her, "Could you just stand here for a minute?"

Trooper Seaton next asked Mr. Sanchez to get out of the car and asked permission to search him for weapons. Mr. Sanchez complied. Trooper Seaton asked Mr. Sanchez if he knew of anything illegal in the car or whether he had any bags in the car. Mr. Sanchez said the car was Ms. Hencz's.

When Trooper Seaton asked Mr. Sanchez for permission to search his bags and possessions in the vehicle, he refused. Trooper Seaton then told Mr. Sanchez, "Stay right here for me."

Trooper Seaton had Corporal Swartz use his canine to walk around the car and do a "canine-sniff." On the second pass, the dog signaled on the right side of the trunk. Based on this indication, Trooper Seaton told Ms. Hencz he was going to search the car. He then got the keys from the car's ignition and popped open the trunk. Inside the trunk, Trooper Seaton found three suitcases containing large bundles of marijuana. The officers arrested Ms. Hencz and Mr. Sanchez and had the vehicle towed. A further search of the vehicle uncovered another bundle of marijuana, methamphetamine, two electronic gram scales, baggies, four rounds of 9–mm ammunition, an empty magazine, and a loaded 9–mm high-point pistol.

Mr. Sanchez was subsequently charged with one count of the class A felony of trafficking in the first degree, under section 195.222, RSMo Cum.Supp.2004, and one count of the class C felony of possession of a controlled substance, under section 195.202, RSMo 2000. Before trial, Mr. Sanchez filed a motion to suppress the physical evidence seized during the traffic stop. Following a hearing, the trial court issued a written order denying the motion. In that order, the trial court found the facts consistent with Trooper Seaton's and Corporal Swartz's testimonies. The trial court further found that a reasonable suspicion of criminal activity was created by the "glaring inconsistencies between the stories given by [Ms.] Hencz and Mr. Sanchez, particularly as to important aspects," "that the traffic violation occurred in [sic] Interstate 70," "that the driver was a Montana resident and her passenger was from Arizona," the driver was visibly nervous

and "her level of nervousness seemed to increase."

Thereafter, Mr. Sanchez waived his right to a jury trial and the case proceeded to trial before the court. At the beginning of trial, Mr. Sanchez renewed his motion to suppress, which the court took up with the trial. Ms. Hencz testified as a witness for the State at trial. At the close of the evidence, the trial court found Mr. Sanchez guilty on both counts. The trial court sentenced Mr. Sanchez, as a prior and persistent offender, to consecutive sentences of thirty years in prison on the trafficking count, and fifteen years in prison on the possession count. Mr. Sanchez filed this appeal.

### Standard of Review

■■ Appellate review of the denial of a motion to suppress is limited to a determination of whether there was substantial evidence to support the ruling. *State v. Rousan*, 961 S.W.2d 831, 845 (Mo. banc 1998). In making this determination, this court reviews both the suppression hearing record and the evidence presented at trial. *State v. Deck*, 994 S.W.2d 527, 534 (Mo. banc 1999). This court views the evidence and any reasonable inferences from the evidence in the light most favorable to the trial court's ruling and defers to the trial court's determination as to the credibility of witnesses. *State v. Granado*, 148 S.W.3d 309, 311 (Mo. banc 2004). "The trial court's ruling will be reversed only if clearly erroneous." *Id.*

### Trial Court Clearly Erred in Denying Motion to Suppress

■ In his sole point on appeal, Mr. Sanchez asserts the trial court erred in denying his motion to suppress and in considering the evidence seized during the search of Ms. Hencz's car at trial. In particular, he contends that, because the

traffic stop was complete at the time Trooper Seaton initiated the search, any search thereafter required new and articulable suspicion that a crime had been committed. He concludes that, because Trooper Seaton did not have any new reasonable suspicion that criminal activity had been committed, the search was illegal and, therefore, the evidence seized should have been suppressed.

■■ "The Fourth Amendment to the United States Constitution guarantees the right of all citizens to be free from unreasonable searches and seizures." *Id.* "A routine traffic stop based on the violation of state traffic laws is a justifiable seizure under the Fourth Amendment." *Id.* Such a stop is constitutional "[s]o long as the police are doing no more than they are legally permitted and objectively authorized to do." *Id.* And, while an officer may detain an individual for a routine traffic stop, indefinite detention is not justified. *Id.* "The detention may only last for the time necessary for the officer to conduct a reasonable investigation of the traffic violation." *Id.*

The facts in this case are very similar to the facts in *Granado*, a recent Missouri Supreme Court case. In *Granado*, a state highway patrolman stopped the defendant after he observed the defendant's truck weaving on an interstate highway. *Id.* at 310. The defendant, who was extremely nervous, went with the officer back to the officer's patrol car and told the patrolman that he and his cousin, who was a passenger in the truck, were en route from Dallas, Texas, to Memphis, Michigan. *Id.* The defendant also said the truck was rented and he was going to be driving it back to Texas by himself because his cousin was going to take the bus back to Texas. *Id.* The defendant also told the patrolman his registration information was in the truck's glove compartment. *Id.* The patrolman

then returned to the truck and requested the paperwork from the defendant's cousin. *Id.* The cousin told the patrolman they were traveling to Capac, Michigan, and they would be returning to Texas later in the week. *Id.*

The patrolman gave the defendant a warning for crossing the centerline and told him he was free to go. *Id.* After the patrolman handed the defendant his license and rental information, the defendant got out of the patrol car and began to walk back to his truck. *Id.* Just before the defendant reached the truck, however, the patrolman stepped out of his patrol car and asked the defendant for consent to search the truck and its contents based on the inconsistencies in the stories of the defendant and his cousin. *Id.* The defendant denied consent. *Id.* The patrolman told the defendant that was his right but, nevertheless, the vehicle could not be moved because he was going to call a K–9 unit to sniff the vehicle. *Id.* The patrolman also told the defendant he was free to go, but he could wait in the patrol car during the search. *Id.* The patrolman also asked the cousin for consent to search the truck. *Id.* The cousin, however, deferred to the defendant as to whether to grant permission to search the truck. *Id.*

Eventually, the K–9 unit arrived on the scene and the dog indicated the presence of narcotics in the truck. *Id.* at 311. Upon searching the truck, the patrolman found approximately thirty-six pounds of marijuana. *Id.* The defendant and his cousin were both arrested. *Id.* The trial court overruled the defendant's motion to suppress and the defendant was convicted of possession of a controlled substance with the intent to deliver. *Id.*

On appeal, the Supreme Court held that the results of the search should have been suppressed because the detention extended beyond the time reasonably necessary to effect its initial purpose, and there was no new reasonable suspicion found during the period of lawful seizure that would support the search. *Id.* at 310. In particular, the Court held that "[t]he purpose of the stop, to investigate a traffic violation, was satisfied as soon as [the defendant] stepped out of the patrol car." *Id.* at 311. "Once th[o]se steps were completed, the patrolman was required to allow [the defendant] to proceed without further questioning unless specific, articulable facts created an objectively reasonable suspicion that the individual was involved in criminal activity." *Id.* In response to the state's argument that the patrolman had a right to search the defendant's car based on suspicious behavior during the traffic stop and the inconsistencies in the defendant's and passenger's statements, the Court stated: "If the search request occurred prior to handing [the defendant] the written warning and telling him that he was free to go, the Court might agree; however, he did not do so." *Id.* at 312. Rather, the Court found that "[n]o specific, articulable facts developed between the time [the defendant] got out of the patrol car and returned to his truck that justifie[d] detaining [the defendant] to ask him further questions." *Id.*

In addition, the Court stated that, "[e]ven if a law enforcement officer does not have reasonable suspicion to further detain a driver at the completion of a traffic stop, the officer may question the driver if the encounter has turned into a consensual one." *Id.* The Court held, however, that the "court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Id.*

In *Granado,* the Court found that, even though the patrolman told the defendant that he was free to go, under the circumstances, no reasonable person would have felt free to leave. *Id.* In particular, the Court noted: both the defendant and his cousin were from Texas; they were pulled over by police on a rural Missouri highway; it was a cold night; neither party had a jacket; and they had just been informed that their truck and personal possessions were being detained for an indefinite period of time. *Id.* Consequently, the Court held that the detention extended beyond the time reasonably necessary to effect its initial purpose and, therefore, the trial court erred in failing to grant the defendant's motion to suppress. *Id.* at 312–13.

Here, Trooper Seaton completed the initial purpose of the traffic stop when he issued Ms. Hencz a warning for traveling too closely. After issuing the warning, Trooper Seaton told Ms. Hencz she was "free to go." Just a few seconds after Ms. Hencz got out of the patrol car to return to her car, however, Trooper Seaton asked Ms. Hencz if he could ask her a few more questions. But, as in *Granado,* there is nothing in the record demonstrating that any new "specific, articulable facts" had developed between the time Trooper Seaton told Ms. Hencz that she was free to go, and the time he asked her if he could ask her a few more questions, that would have justified Trooper Seaton detaining her further. *Id.* at 312.

The only difference between this case and *Granado* is that Trooper Seaton believed, and the trial court found, that, at the end of the traffic stop, the facts in their totality were sufficient to create reasonable suspicion that Ms. Hencz and Mr. Sanchez were engaged in criminal activity. That difference does not impact this court's assessment of the legality of the stop, however, because, in *Granado,* the Supreme Court found that reasonable suspicion developed during the initial traffic stop would not support further detention, once the law enforcement officer handed the driver the written warning and said that the driver was free to go. *Id.* Instead, *Granado* requires that there must be some additional specific, articulable facts arising between the time the driver was released and the time the law enforcement officer asked further questions to justify continued detention. *Id.*

Additionally, the record fails to demonstrate that the encounter between Trooper Seaton and Ms. Hencz, after the traffic stop was completed, was consensual. While Trooper Seaton testified that Ms. Hencz was free to leave at this point, the record demonstrates that Trooper Seaton actually told Ms. Hencz, "Could you just stand here for a minute." In addition, he told Mr. Sanchez, "Stay right here for me." Moreover, Ms. Hencz and Mr. Sanchez were both from Montana. They were pulled over by a state trooper on the side of a Missouri interstate highway. The temperature was over one hundred degrees, and their car and all of their personal possessions were being detained. The facts here are similar to *Granado,* which as discussed above, involved an out-of-state defendant who was told he was free to leave, but it was a cold night on a Missouri highway, and all of his personal possessions were being indefinitely detained by a highway patrolman. *Id.* Accordingly, as in *Granado,* under the totality of the circumstances, no reasonable person would have believed they were free to leave. *Id.*

In sum, there is nothing in the record that would have given Trooper Seaton reasonable suspicion that Ms. Hencz and Mr. Sanchez were involved in criminal activity after the traffic stop was completed

and Trooper Seaton told Ms. Hencz she was free to go. Moreover, under the totality of the circumstances, no reasonable person would have felt free to leave following completion of the traffic stop. Accordingly, the trial court clearly erred in denying Mr. Sanchez's motion to suppress and should not have considered the evidence seized during the search at trial. "In the absence of the seized evidence, there was insufficient evidence to support the conviction." *Id.* at 313. However, "[t]he erroneous admission of evidence does not preclude retrial because the state may produce other evidence that cures the evidentiary insufficiency." *Id.*

The trial court's judgment is reversed, and the case is remanded.

All concur.