STATE of Missouri, Appellant,

v.

Luconios L. ROSS,
Defendant/Respondent.

No. ED 90375.

Missouri Court of Appeals,
Eastern District,
Division Two.

June 3, 2008.

Robert E. Parks, Union, MO, for appellant.

Frank K. Carlson, Union, MO, for respondent.

LAWRENCE E. MOONEY, Presiding Judge.

Today we confront an issue that is hardly novel, but nevertheless merits a published opinion. We publish this opinion neither to establish new legal precepts nor to expand their reach, but rather to recount settled legal principles that obviously require repetition. Although we do not discourage law enforcement's admirable efforts to interdict the transportation of illegal drugs, we remind them of the constitutional mandates that govern their conduct.

The State appeals from the trial court's order sustaining Luconios L. Ross's motion to suppress evidence seized in a search of a rental vehicle driven by Mr. Ross after he was detained for a traffic offense. The State contends the trial court erred in sustaining the motion because Mr. Ross lacked standing to challenge the search of the rental vehicle and because the search was not a product of an unlawful detention of Mr. Ross. However, this Court holds that Mr. Ross was unlawfully detained after the completion of the traffic stop. And because the evidence was discovered as a direct result of the illegal detention, it must be excluded as fruit of the improper detention. Accordingly, we affirm the trial court's order.

*Factual Background*

During the morning of April 18, 2003, Missouri State Highway Patrol Corporal Russell Seaton was on routine patrol on Interstate Highway 44. As he was traveling eastbound, Corporal Seaton observed a Dodge Intrepid approaching his car from behind. The corporal believed the Dodge was traveling in excess of the 70 mile-an-hour speed limit because the Dodge was closing in on his patrol vehicle, which was traveling at the speed limit. The trooper activated his radar, which indicated the Dodge was traveling at 73 miles-per-hour, above the legal limit. Corporal Seaton then turned on his emergency lights and siren, and pulled the Dodge over for speeding. The traffic stop took place along eastbound Highway 44 near the 249-mile marker in Franklin County.

Corporal Seaton approached the stopped Dodge, which had Michigan license plates, and asked the driver for his driver's license and proof of insurance. The driver was Mr. Ross, whose later motion to suppress is the subject of this appeal. Mr. Ross produced a driver's license; Mr. Malcolm Agnew, the passenger sitting in the front passenger seat, produced rental documents for the vehicle. But neither Mr. Agnew nor Mr. Ross was listed on the documents as the renter of the Dodge. Instead, the rental agreement recorded a "Jennifer Agnew" as the renter. Further, the documents revealed that no one other

than "Jennifer Agnew" was authorized to drive the rental vehicle.

Corporal Seaton asked Mr. Ross to step back to the patrol car. Mr. Ross complied and sat in the patrol car as Corporal Seaton ran a routine operator and license check and reviewed the rental documents. Approximately fifteen minutes into this traffic stop, while Corporal Seaton and Mr. Ross were still seated in the patrol car, a second Highway Patrolman, Corporal Bartel, arrived on the scene. Corporal Bartel exited his vehicle and got into Corporal Seaton's vehicle, taking the right rear passenger's seat.

During the course of the records check, Corporal Seaton and Mr. Ross engaged in general conversation. Mr. Ross stated he and Mr. Agnew had been on a road trip together for several days, traveling from Michigan to Arkansas, Tennessee, and Oklahoma, and that they were headed back to Michigan. According to Corporal Seaton, Mr. Ross appeared extremely nervous. Corporal Seaton testified that Mr. Ross kept looking out the window and would never make eye contact with him. Corporal Seaton noticed that Mr. Ross was trembling and seemed out of breath; he even observed the pulsations of Mr. Ross's carotid artery. According to Corporal Seaton, the longer Mr. Ross sat in the patrol car, the more nervous he became. After speaking with Mr. Ross, Corporal Seaton exited his patrol car and went to speak with Mr. Agnew, who was still seated in the stopped Dodge. Mr. Agnew also gave an accounting of the road trip, which somewhat varied from Mr. Ross's version of events.

Corporal Seaton returned to his patrol car, and ultimately received a clear criminal history check on Mr. Ross and radio confirmation of the validity of Mr. Ross's license. Corporal Seaton gave Mr. Ross a written warning, returned his driver's li-

cense and the rental documents to Mr. Ross, and told Mr. Ross that "he was free to go." Mr. Ross then exited the patrol car.

But as Mr. Ross was walking in front of the patrol car, on his way back to the rented Dodge, he allegedly turned around. According to Corporal Seaton, it appeared as if Mr. Ross wanted to ask him a question. Corporal Seaton exited his patrol car and verbally re-engaged Mr. Ross, by calling out Mr. Ross's name in the form of a question. In response, Mr. Ross asked if Mr. Agnew should drive. Corporal Seaton stated that would probably be best. Corporal Seaton then asked Mr. Ross if he could ask him a few more questions, to which Mr. Ross replied, "No problem."

Corporal Seaton then proceeded to ask Mr. Ross a series of questions about drugs and drug trafficking. He first asked Mr. Ross if he was aware of the drug problem in the United States, and if he was aware that people of all ages, sex, races, and religions transported narcotics across the country, every day, in all types of vehicles. Mr. Ross stated that he was aware of this. Corporal Seaton then asked Mr. Ross what he thought should happen to those people—if he thought they should go to prison or get treatment instead. Mr. Ross, who during the course of the conversation had stated he was a corrections officer for the Michigan Department of Corrections, stated, "Well, we don't rehabilitate." Corporal Seaton then inquired if Mr. Ross had anything illegal, such as drugs and weapons, in the rented Dodge. Corporal Seaton also asked Mr. Ross for consent to search the vehicle. Mr. Ross stated he did not have anything illegal in the vehicle and that he did not mind if Corporal Seaton searched the car. Corporal Seaton prepared a written consent form for Mr. Ross to read and sign. But after reading the form, Mr. Ross withdrew his consent, stat-

ing that Corporal Seaton would first have to obtain Mr. Agnew's consent to search the vehicle. At this point, Corporal Seaton told Mr. Ross to "wait right there."

Corporal Seaton prepared a second consent form and then approached Mr. Agnew. Corporal Seaton asked basically the same litany of questions regarding drugs and drug trafficking of Mr. Agnew that he had previously asked of Mr. Ross. Corporal Seaton then presented Mr. Agnew with the consent form, informing him that he had the right to refuse consent. Mr. Agnew, whose hands were visibly shaking, took the form, read it, and then refused to consent to a search of the vehicle. At this point, Corporal Seaton returned to his patrol car and informed Corporal Bartel that Mr. Ross and Mr. Agnew were refusing to consent to a search of their car. Corporal Bartel exited the patrol car and took Mr. Agnew back to sit in his patrol car. Corporal Seaton called and requested that the canine officer, Corporal Swartz, come to the scene.

Corporal Swartz arrived on the scene, approximately nine minutes later, nearly fifty-five minutes after Corporal Seaton had initially stopped Mr. Ross and Mr. Agnew. Corporal Swartz, along with his dog, Yote, conducted a canine sniff around the exterior of the rental vehicle. Yote apparently sensed the odor of narcotics and scratched at the trunk seam. Corporal Swartz opened the trunk and discovered several bundles of what he believed to be marijuana, wrapped in aluminum foil underneath the spare tire. Mr. Ross and Mr. Agnew were both arrested.

A Franklin County grand jury returned an indictment against Mr. Ross, charging him with the class B felony of Possession of a Controlled Substance With Intent to Distribute or Deliver or Sell, in violation of Section 195.211 RSMo. Mr. Ross filed a motion to suppress evidence. The parties submitted Mr. Ross's motion to the trial court for determination based upon evidence adduced at a hearing on Mr. Agnew's motions to suppress evidence and statements, filed in the case of *State of Missouri v. Malcolm D. Agnew*, stemming from the same traffic stop.

■ The trial court initially denied Mr. Ross's motion, but Mr. Ross filed a motion to reconsider. Upon its reconsideration, the trial court sustained Mr. Ross's motion and entered its order suppressing the evidence, "based upon the rationale of *State v. Granado* and *Brendlin v. California*."[1] The State now appeals.[2]

### Standard of Review

This Court's review of a trial court's ruling on a motion to suppress is limited to determining whether the decision is supported by substantial evidence. *State v. Johnson*, 207 S.W.3d 24, 44 (Mo. banc 2006); *State v. Watkins*, 73 S.W.3d 881, 883 (Mo.App. E.D.2002). In reviewing the sufficiency of the evidence, we consider all evidence and all reasonable inferences therefrom in the light most favorable to the trial court's ruling. *Id.* Additionally, we defer to the trial court's factual findings and credibility determinations. *State v. Sund*, 215 S.W.3d 719, 723 (Mo. banc 2007); *State v. Dixon*, 218 S.W.3d 14, 18

---

1. *State v. Granado*, 148 S.W.3d 309 (Mo. banc 2004); *Brendlin v. California*, — U.S. —, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007).

2. Generally, the State "cannot appeal a judgment for the accused, whether it is upon a verdict of acquittal or upon a determination of a question of law, unless a right of appeal is unequivocally conferred by statute." *State v. Stein*, 876 S.W.2d 623, 625 (Mo.App. E.D. 1994). Section 547.200 permits the State to appeal from an order suppressing evidence. Section 547.200.1(3); *State v. Gabbert*, 213 S.W.3d 713, 717 (Mo.App. W.D.2007).

(Mo.App. W.D.2007). We will reverse a trial court's ruling on a motion to suppress only if it is clearly erroneous; that is, only if we are left with a definite and firm impression that a mistake has been made. *Id.* Whether conduct violates the Fourth Amendment is an issue of law that this Court reviews *de novo.* *Sund,* 215 S.W.3d at 723.

*Discussion*

The State advances two arguments as to why the trial court erred in sustaining Mr. Ross's motion to suppress. First, the State contends the court so erred because Mr. Ross did not have a legitimate expectation of privacy in the rental vehicle from which the evidence was seized, and thus Mr. Ross lacked standing to challenge the search of the vehicle.[3] Second, the State contends that the seizure of the evidence Mr. Ross sought to suppress was not a product of an unlawful detention of Mr. Ross, but rather was the result of a consensual encounter between Mr. Ross and the police.

■■■ The Fourth Amendment to the United States Constitution guarantees the right of all citizens to be free from unreasonable searches and seizures. U.S. CONST. amend. IV. The prohibition of the Fourth Amendment against unreasonable searches and seizures applies to the states through the due-process clause of the Fourteenth Amendment. *State v. Witherspoon,* 460 S.W.2d 281, 283–4 (Mo.1970); *State v. DuBose,* 617 S.W.2d 509, 513 (Mo. App. E.D.1981). Missouri's constitutional protection against unreasonable searches and seizures, found in Article I, Section 15 of the Missouri Constitution, is coextensive with that provided by the Fourth Amendment of the United States Constitution. *State v. Kempa,* 235 S.W.3d 54, 60 fn. 5 (Mo.App. S.D.2007). Pertinent to our discussion in this case is the constitutional protection afforded against unreasonable seizures. "A "seizure" occurs when the totality of the circumstances surrounding the incident indicates that 'a reasonable person would have believed that he was not free to leave.'" *Sund,* 215 S.W.3d at 723 (quoting *State v. Werner,* 9 S.W.3d 590, 600 (Mo. banc 2000)).

■■■ "A routine traffic stop based upon on an officer's observation of a violation of state traffic laws is a reasonable seizure under the Fourth Amendment." *Sund,* 215 S.W.3d at 723. "So long as the police are doing no more than they are legally permitted and objectively authorized to do, the resulting stop or arrest is constitutional." *State v. Granado,* 148 S.W.3d 309, 311 (Mo. banc 2004). The fact that the police may detain a person for a routine traffic stop does not, however, justify indefinite detention. *Sund,* 215 S.W.3d at 723. "The detention may only last for the time necessary for the officer to conduct a reasonable investigation of the traffic violation." *Id.* (quoting *State v. Barks,* 128 S.W.3d 513, 516 (Mo. banc 2004)). "A reasonable investigation of a traffic violation may include 'asking for the driver's license and registration, requesting the driver to sit in the patrol car, and asking the driver about his destination and purpose.'" *Barks,* 128 S.W.3d at 517 (quoting *State v. McNaughton,* 924 S.W.2d 517, 523 (Mo.App.1996))(overruled on other grounds by *State v. Pond,* 131 S.W.3d 792 (Mo. banc 2004)(other citations omitted)).

---

3. We need not address the State's contention that Mr. Ross lacked a legitimate expectation of privacy in the rental vehicle. Mr. Ross has standing here because, as detailed in the remainder of this decision, the search of the vehicle was a fruit of Mr. Ross's wrongful detention. *See Sund,* 215 S.W.3d at 722 n. 4.

■ To repeat, Corporal Seaton testified that he stopped Mr. Ross's car after radar indicated it was traveling in excess of the legal speed limit. Corporal Seaton approached the vehicle and asked Mr. Ross for his driver's license and proof of insurance. Mr. Ross produced a driver's license; Mr. Agnew produced rental documents for the vehicle. Corporal Seaton then asked Mr. Ross to step back to the patrol car. Mr. Ross complied and sat in the patrol car as Corporal Seaton ran a routine operator and license check, reviewed the rental papers, and filled out a written warning. After receiving a clear criminal history check on Mr. Ross and receiving radio confirmation that Mr. Ross had a valid license, Corporal Seaton returned the driver's license and paperwork to Mr. Ross, who was still sitting in the patrol car, and told Mr. Ross that he was "free to go."

At this point, the purpose of the stop, to investigate a traffic violation, was satisfied; the traffic stop was complete. *See Sund,* 215 S.W.3d at 723; *Granado,* 148 S.W.3d at 311; *Barks,* 128 S.W.3d at 517. Therefore, at this juncture, Corporal Seaton was required to allow Mr. Ross "to proceed without further questioning unless specific, articulable facts created an objectively reasonable suspicion that the individual was involved in criminal activity." *Id.*

■ But Corporal Seaton had no such facts. The only factors cited by Corporal Seaton as arousing his suspicions during the traffic stop were Mr. Ross's nervousness and the conflicting stories given by Mr. Ross and Mr. Agnew. Nervousness alone does not give rise to reasonable suspicion. *Barks,* 128 S.W.3d at 517 (citing *State v. Woolfolk,* 3 S.W.3d 823, 829 (Mo.App. W.D.1999)). Nervousness, together with other factors, however, can be relevant in determining whether reasonable suspicion exists. *Woolfolk,* 3 S.W.3d

at 829. For instance, nervousness during a traffic stop, coupled with inconsistent stories, might support a search, *if* the search request occurs prior to the completion of the traffic stop. *Granado,* 148 S.W.3d at 312. (Emphasis not in original.) Here, however, as in *Granado,* the search request came well after completion of the traffic stop. Therefore, Mr. Ross's nervousness and the conflicting accounts cannot provide the factual predicate for reasonable suspicion that criminal activity is afoot to justify detention and further questioning of Mr. Ross beyond the completion of a traffic stop. *State v. Dickerson,* 172 S.W.3d 818, 820 (Mo.App. E.D.2005). Corporal Seaton himself admitted that at the time he told Mr. Ross he was free to go, he did not have probable cause to detain Mr. Ross and search the car. While he had a feeling that criminal activity was afoot, he believed there was nothing else he could do at that point to further detain Mr. Ross for additional questioning. Therefore, he told Mr. Ross that he was free to go. Critically, Corporal Seaton failed to develop any specific, articulable facts between the time Mr. Ross was released at the completion of the traffic stop and the time Corporal Seaton verbally re-engaged Mr. Ross that would justify detaining Mr. Ross for further questioning. *See Granado,* 148 S.W.3d at 312 (requiring that there must be some additional specific, articulable facts arising between the time the driver is released and the time the law enforcement officer asks further questions to justify continued detention). Here, Mr. Ross simply exited the patrol car and began walking back to the rental vehicle. As he was walking back in front of the patrol car, Mr. Ross allegedly turned. Corporal Seaton then exited his patrol car and verbally re-engaged Mr. Ross, by calling out Mr. Ross's name in the form of a question. The ensuing conversation eventually resulted in Mr. Ross and Mr. Agnew refus-

ing to consent to a search of the vehicle, at which time Corporal Seaton called in the canine unit and ultimately searched the vehicle.

■■■ The State attempts to justify Corporal Seaton's actions following the traffic stop's conclusion, asserting that the encounter between Corporal Seaton and Mr. Ross had become consensual. The State is correct in principle—that "[e]ven if a law enforcement officer does not have reasonable suspicion to further detain a driver at the completion of a traffic stop, the officer may question the driver if the encounter has turned into a consensual one." *Granado*, 148 S.W.3d at 312. "So long as the person is free to leave, the officer can talk to him and is free to ask whether he has contraband on his person, or in his car...." *Id.; accord, Barks*, 128 S.W.3d at 517; *Woolfolk*, 3 S.W.3d at 830. "This does not mean, however, that an officer is free to involuntarily detain a driver without reasonable suspicion under the guise of simply engaging in a voluntary conversation." *Woolfolk*, 3 S.W.3d at 830; *accord, Sund*, 215 S.W.3d at 723–724; *Granado*, 148 S.W.3d at 312; *Barks*, 128 S.W.3d at 517. "An encounter is consensual only if 'a reasonable person would feel free to disregard the police and go about his business.'" *Sund*, 215 S.W.3d at 724 (quoting *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)). The question, then, is whether Corporal Seaton's conduct would have communicated to a reasonable person in Mr. Ross's position that he was free to decline the officer's requests or otherwise terminate the encounter. *Sund*, 215 S.W.3d at 724; *Granado*, 148 S.W.3d at 312. To answer this question, a court must consider the totality of the circumstances surrounding the encounter. *Id.* Although not an exclusive list, factors to consider are the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. *State v. Dixon*, 218 S.W.3d 14, 20 (Mo.App. W.D.2007). "'As a rule, a motorist who is involuntarily stopped by a law enforcement officer, for whatever reason, is going to be very reluctant to leave the scene until it is perfectly clear that he or she is free to do so.'" *Sund*, 215 S.W.3d at 724 (quoting *State v. Taber*, 73 S.W.3d 699, 706 (Mo.App. W.D.2002)).

The decisions in *Granado, Sund,* and *Sanchez* are instructive here. First, the facts here nearly mirror those in *Granado*, upon which the trial court relied in suppressing the evidence. In *Granado*, a state highway patrolman stopped Mr. Granado after observing his truck weaving outside its lane of traffic on an interstate highway. After being stopped, Mr. Granado went with the patrolman to the patrol car, where he sat while the patrolman reviewed Mr. Granado's license and registration and filled out a written warning. As here, the patrolman noticed that Mr. Granado appeared visibly nervous and that Mr. Granado and his passenger had given inconsistent accounts of their trip. The patrolman gave Mr. Granado a written warning for crossing the center line, handed Mr. Granado his license and rental agreement, and told Mr. Granado that he was free to go. Mr. Granado exited the patrol car and started to walk back toward his truck. Just before Mr. Granado reached the truck, the patrolman stepped out of his patrol car, informed Mr. Granado of the discrepancies in the statements given by Mr. Granado and his passenger, and asked for permission to search Mr. Granado's vehicle. Mr. Granado refused to consent. The patrolman told Mr. Granado that was his right, but the vehicle could not be moved because he was calling

in a canine unit to perform a "sniff" of the vehicle. The patrolman told Mr. Granado that although he was still free to go, he could wait in the patrol car during the search. The dog signaled, indicating the presence of narcotics in the truck, and a later search of the truck revealed drugs. Mr. Granado and his passenger were arrested. The trial court overruled Mr. Granado's motion to suppress. *Granado*, 148 S.W.3d at 310–311.

But the Missouri Supreme Court held that the trial court should have granted the motion and suppressed the evidence seized during the search. *Id.* at 312–313. The Court first found that the traffic stop was completed, and that therefore any search thereafter required new and articulable suspicion that Mr. Granado had committed a crime. *Id.* at 311. The Court also determined that the patrolman did not have a reasonable suspicion that Mr. Granado was engaged in criminal activity to justify detaining Mr. Granado beyond the traffic stop for further questioning. *Id.* at 312. The Court further concluded that the encounter was not consensual because, even though the patrolman told Mr. Granado that he was free to go, a reasonable person would not have felt free to leave. *Id.* The Court noted that Mr. Granado and his passenger were from out-of-state; they were pulled over by police on a rural Missouri highway; it was a cold night; neither party had a jacket; and they had just been informed that their truck and personal possessions were being detained for an indefinite period of time to facilitate a canine search. *Id.*

Similarly, in the *Sund* decision, the Court held that the defendant there had been illegally detained and that therefore, the seized evidence should be suppressed. *Sund*, 215 S.W.3d at 724. In that case, an officer stopped the vehicle driven by Ms. Sund because he had observed the vehicle drift onto the dashed white line dividing the traffic lanes and wanted to ensure the driver was neither intoxicated nor falling asleep. Upon approaching the vehicle, the officer asked Ms. Sund for her driver's license and vehicle registration. Ms. Sund produced her license and car rental agreement. Before returning to his patrol car to run a computer check on her license, the officer asked Ms. Sund a series of questions to determine whether she was intoxicated or sleepy, and determined that she was neither. The officer then ran a check on Ms. Sund's license, which showed no outstanding violations. He then returned to Ms. Sund's vehicle and requested identification from her passenger, Ms. Wolfe. He then asked Ms. Sund to join him in his patrol car, which she did. Ms. Sund sat in the patrol car while the officer filled out a warning ticket and waited for the results of computer checks. Once the results arrived, the officer left the patrol car to return Ms. Wolfe's license. He then motioned for Ms. Sund to exit the patrol car, which she did. The officer then returned her license, handed her the warning ticket, and told Ms. Sund to "be careful." *Id* at 721–722.

As Ms. Sund walked back to her vehicle, the officer asked her if he could search the vehicle. Ms. Sund replied, "Sure." When the officer asked Ms. Wolfe to open the trunk however, she asked what was going on. The officer then stated that he believed Ms. Sund had lied to him and that "interstate highways are used to conceal drugs, weapons, people and other illegal things." After some further back-and-forth between the officer and the women, Ms. Sund and Ms. Wolfe refused to open the trunk. The officer then gave the women a choice to consent to his searching the trunk or to wait for about forty minutes until a canine unit arrived to conduct the search. Only then did the two women consent and open the trunk. Upon search-

ing the trunk, the officer found drugs. He arrested the two women, who were later indicted for second-degree drug trafficking. Ms. Sund moved to suppress the evidence seized during the search of the vehicle, which the trial court overruled. *Id.* at 722.

On appeal, the Supreme Court held that the trial court should have granted the motion and suppressed the evidence seized during the search. Id. at 724. The Court first found that the traffic stop was completed when the officer handed Ms. Sund the warning ticket, returned her license, and told her to "be careful." *Id.* at 723. The Court next determined that the officer did not have reasonable suspicion of criminal activity that would have justified continued detention or a search of the vehicle. *Id.* As in our case, the arresting officer admitted as much. The Court then concluded that, under the totality of the circumstances, a reasonable person in Ms. Sund's and Ms. Wolfe's position would not have felt free to leave at the time they opened the trunk in response to the officer's demand that if they did not do so, he would call the canine unit to assist in a search. *Id.* at 724. The Court noted that the two women were from out of state; they had been pulled over on an interstate highway running through a rural area of Missouri late on a cold February night; and the two woman had nowhere to go and would have had to abandon their rented car and their possessions if they did leave. *Id.* The Court held that the encounter was not consensual, but rather constituted an unreasonable detention because the officer did not have reasonable suspicion of criminal activity. *Id.*

Our facts are also similar to those in *State v. Sanchez,* 178 S.W.3d 549 (Mo.App. W.D.2005). In that case, Trooper Russell Seaton, apparently the same trooper as in our present case, stopped a car with Montana plates for following too closely. Ms. Hencz was the driver of the stopped car; Mr. Sanchez was a passenger. Upon approaching the car, the trooper asked Ms. Hencz for her driver's license and proof of insurance. The trooper then asked Ms. Hencz to step back to the rear of the car. He then questioned her about the purpose of her trip and about her passenger. The trooper then approached the passenger side of the car, asked Mr. Sanchez some questions, and requested identification. After questioning Mr. Sanchez, the trooper took Ms. Hencz back to his patrol car, where she sat while he ran a computer check on the two identifications. The trooper noticed that Ms. Hencz appeared nervous and that she gave evasive answers. The trooper also noticed that Ms. Hencz's stories were inconsistent with those given by Mr. Sanchez, and that Mr. Sanchez had what appeared to be a fake identification card. At some point, he called for backup. Eventually, the trooper received confirmation that the car was properly registered and that Ms. Hencz had a valid driver's license. He then issued a warning for Ms. Hencz for following too closely, handed her paperwork back to her, and told Ms. Hencz that she was free to go. *Sanchez,* 178 S.W.3d at 550–551.

Ms. Hencz exited the patrol car and began walking back to her car. As soon as she got to the rear of her car, the trooper exited his patrol car and asked Ms. Hencz if he could ask her a few more questions. She agreed and returned to the front of the patrol car. The trooper then asked if she knew of the drug problem in the country. She indicated that she did. He then asked her if she knew that people transported drugs across the country everyday in all types of vehicles. She said that she did not. He then told Ms. Hencz that he was not accusing her of any wrongdoing, but that he was suspicious. He then asked her for consent to search her car. She

refused. The trooper then said, "Could you just stand here for a minute?" *Id.* at 552.

The trooper then approached the car, asked Mr. Sanchez to get out of the car, and asked permission to search him for weapons. Mr. Sanchez complied. When the trooper asked Mr. Sanchez for permission to search his bags and possessions in the vehicle, Mr. Sanchez refused. The trooper then told Mr. Sanchez, "Stay right here for me." The second trooper, who had been called in as backup, then used his dog to perform a canine sniff of the car. The dog signaled and, based on this circumstance, the trooper searched the car where they discovered drugs. Ms. Hencz and Mr. Sanchez were arrested. The trial court denied Mr. Sanchez's motion to suppress the physical evidence seized as a result of the search. *Id.* at 552–553.

On appeal, the Court held that the evidence seized during the search should have been suppressed and that the trial court clearly erred in denying the motion to suppress. *Id.* at 556. The Court first found that the traffic stop had come to a conclusion when the trooper issued the warning and told Ms. Hencz that she was free to go. *Id.* at 555. The Court then found that there was nothing demonstrating that any new, specific, articulable facts had developed between the time the trooper told Ms. Hencz she was free to go, and the time he asked her if he could ask her a few more questions, that would have justified further detention of Ms. Hencz. *Id.* The Court further found that the encounter between the trooper and Ms. Hencz, after the completion of the traffic stop, was not consensual. *Id.* The Court noted that Ms. Hencz and Mr. Sanchez were from out-of-state; they were pulled over by a state trooper on a Missouri interstate highway; the temperature was over one hundred degrees; and their car and all of their personal possessions were being detained. Further, the Court noted that although the trooper had told Ms. Hencz she was free to leave, he then said, "Could you just stand here for a minute?" He then told Mr. Sanchez, "Stay right here for me." The Court found that under these circumstances, no reasonable person would have believed they were free to leave. *Id.*

Here, considering the totality of the circumstances, we hold that a reasonable person in Mr. Ross's position would also not have felt free to leave. As in these other cases, Mr. Ross and his passenger were both from out of state. They were pulled over by a state highway patrolman on the side of an interstate highway running through an exurban area of Missouri. At the completion of the traffic stop, Mr. Ross exited Corporal Seaton's patrol car and began walking back to his vehicle. Corporal Seaton re-engaged Mr. Ross in conversation before Mr. Ross had even returned to his car. At the time Corporal Seaton re-engaged Mr. Ross in conversation, there were two troopers on the scene, Corporal Seaton and Corporal Bartel. The two officers had service weapons, although we note Corporal Seaton did not draw his weapon until he arrested Mr. Ross.

After verbally re-engaging Mr. Ross, Corporal Seaton proceeded to ask Mr. Ross a series of questions about drugs and drug trafficking. Corporal Seaton first asked Mr. Ross if he was aware of the drug problem in the United States, and if he was aware that people of all ages, sex, races, and religions transport narcotics across the country in all types of vehicles every day. Corporal Seaton then asked Mr. Ross what he thought should happen to those people—should they go to prison or get treatment. Corporal Seaton then asked Mr. Ross if he had anything illegal in his car, such as drug and weapons.

Corporal Seaton also asked Mr. Ross for consent to search the vehicle. Mr. Ross initially stated he did not have anything illegal and he did not see a problem with Corporal Seaton searching the car. After reading the written consent form, however, Mr. Ross withdrew his consent, telling Corporal Seaton that he would have to speak with Mr. Agnew. At this point, Corporal Seaton told Mr. Ross to "wait right there."

We recognize that an officer is free to ask whether an individual has contraband on his person or in his car, so long as that individual is free to leave. We also know, however, that these questions could reasonably be perceived as nothing more than veiled accusations. An officer may not involuntarily detain a driver without reasonable suspicion under the guise of simply engaging in a voluntary conversation. Given Corporal Seaton's acknowledgment that he did not have sufficient cause to further detain Mr. Ross at the completion of the traffic stop, even though he felt criminal activity was afoot, this appears to be exactly what occurred.

■ Given the totality of circumstances, Corporal Seaton's conduct would have communicated to a reasonable person in Mr. Ross's position that he was not free to decline Corporal Seaton's requests or otherwise terminate the encounter. Indeed, as in *Sanchez,* after Mr. Ross refused to give consent, Corporal Seaton told Mr. Ross to "wait right there." Corporal Seaton testified that once Mr. Ross and Mr. Agnew refused to give consent, they were not free to leave, and that he intended to hold the two men until the canine officer arrived on the scene. Corporal Seaton acknowledged that the only things which caused him concern that criminal activity was afoot that did not exist during the initial traffic stop were the continuation and acceleration of Mr. Agnew's nervousness and the two men's refusal to give consent to search the vehicle. Again, nervousness alone does not give rise to reasonable suspicion. *Barks,* 128 S.W.3d at 517; *Woolfolk,* 3 S.W.3d at 829. And, law enforcement officers cannot use a driver's refusal to consent to search a vehicle to constitute the requisite reasonable suspicion to justify the search. *Woolfolk,* 3 S.W.3d at 830.

The encounter between Corporal Seaton and Mr. Ross, following the conclusion of the traffic stop, was not consensual, but constituted a detention that was unreasonable because the officer did not have reasonable suspicion of criminal activity. It was only through Mr. Ross's illegal detention that the officers gained access to the vehicle's trunk and its contents. The evidence seized as a result of this search must, therefore, be suppressed, for evidence discovered and later found to be derivative of a Fourth Amendment violation must be excluded as fruit of the poisonous tree. *Sund,* 215 S.W.3d at 724.

*Conclusion*

To conclude, the traffic stop in this case was completed at the time Corporal Seaton handed Mr. Ross his license, paperwork, and written warning and told Mr. Ross that he was free to go. Corporal Seaton had not developed specific, articulable facts during the traffic stop that would have supported an objectively reasonable suspicion of criminal activity justifying detention of Mr. Ross for further inquiry. Nor is there any evidence that Corporal Seaton developed any specific, articulable facts between the time Mr. Ross was released at the completion of the traffic stop and the time Corporal Seaton verbally reengaged Mr. Ross that would justify detaining Mr. Ross for further questioning. Given the totality of the circumstances surrounding the encounter between Corporal

Seaton and Mr. Ross, following the completion of the traffic stop, a reasonable person in Mr. Ross's position would not have felt free to leave. Corporal Seaton's conduct would have communicated to a reasonable person in Mr. Ross's position that he was not free to decline Corporal Seaton's requests or otherwise terminate the encounter. Accordingly, the encounter was not consensual, but rather constituted an unreasonable detention of Mr. Ross. Because the evidence found upon the search of the vehicle was discovered as a direct result of that illegal detention, it must be excluded as fruit of the improper detention. The trial court did not err in sustaining Mr. Ross's motion to suppress.

We affirm the trial court's order sustaining Mr. Ross's motion to suppress evidence.

BOOKER T. SHAW, J., and KURT S. ODENWALD, J., concur.