STATE of Missouri, Respondent,

v.

Carl A. WOOLFOLK, Appellant.

No. WD 55803.

Missouri Court of Appeals, Western District.

Aug. 17, 1999.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 5, 1999.

Application for Transfer Denied Nov. 23, 1999.

Earl F. Seitz, Columbia, for appellant.

Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before Judge LAURA DENVIR STITH, Presiding, Judge HAROLD L. LOWENSTEIN and Judge JAMES M. SMART, Jr.

LAURA DENVIR STITH, Presiding Judge.

Defendant Carl Allan Woolfolk appeals his conviction of Possession of a Controlled Substance, in violation of § 195.202 RSMo 1994, for which he was sentenced to three years imprisonment in the Missouri Department of Corrections. Execution of sentence was suspended, and Mr. Woolfolk was placed on five years supervised probation. On appeal, Mr. Woolfolk asserts error in denial of his motion to suppress the marijuana because: 1) the circumstances surrounding the traffic stop did not give rise to specific, articulable facts creating a reasonable suspicion that Defendant was engaged in criminal activity; 2) the trooper's questioning of Mr. Woolfolk subsequent to the completion of the traffic stop constituted an unreasonable seizure of Mr. Woolfolk in violation of his Fourth Amendment rights; and 3) Mr. Woolfolk did not voluntarily consent to the search.

Because we find that the officer did not have reasonable suspicion to detain Mr. Woolfolk once the traffic stop was complete, and that Mr. Woolfolk was not free to leave thereafter but rather was in custody, we find that the trial court erred in denying the motion to suppress and in considering the evidence obtained in the unlawful search. Without this evidence, there was insufficient evidence to sustain the conviction. Accordingly, we reverse the conviction.

## I. FACTUAL AND PROCEDURAL BACKGROUND

According to the testimony at the hearing on the motion to suppress and at trial, at about 4:20 p.m. on August 10, 1997, Trooper Russell F. Morlando was conducting routine traffic duties on southbound U.S. Highway 63 north of Ashland, Missouri, when he observed a Corvette with its top down approaching him from behind in the passing lane. The Corvette slowed down and pulled in behind the vehicle directly behind Trooper Morlando. Trooper Morlando pulled over onto the right shoulder of the highway and allowed the cars to pass him. As they passed, he noticed that the reverse lights on the Corvette were illuminated while it was moving forward, in violation of statute. Trooper Morlando pulled back onto the highway behind the Corvette and pulled it over.

Mr. Woolfolk's demeanor was typical upon Trooper Morlando's approach to the vehicle—he was nervous, but not excessively so. Trooper Morlando informed Mr. Woolfolk of the problem, and stepped to

the rear of Mr. Woolfolk's vehicle to see whether the backup lights were still on. They were, but once Mr. Woolfolk manipulated the gear selector lever the reverse lights went off, correcting the problem. The trooper informed Mr. Woolfolk that he would only get a warning. Mr. Woolfolk still seemed apprehensive, but not unusually so.

Trooper Morlando then requested Mr. Woolfolk's driver's license, and proof of insurance or registration. Mr. Woolfolk provided him with the appropriate documents, and the trooper returned to his patrol car to make inquiries regarding Mr. Woolfolk's driving status, warrants, and criminal history. The check confirmed that Mr. Woolfolk's driver's license was valid and that he had no outstanding warrants. The check also reported that Mr. Woolfolk had a lengthy traffic record and one prior criminal arrest involving possession and transportation of marijuana. The check did not report whether or not Mr. Woolfolk was convicted of those charges; in fact, he had not been convicted. Trooper Morlando later testified that, while he was in his squad car making the checks and filling out the required paperwork, Mr. Woolfolk seemed concerned about him, and his nervousness did not diminish during the course of the traffic stop.

Trooper Morlando again approached Mr. Woolfolk's vehicle, and advised him that he would only be issued a warning, and returned his driver's license and other paperwork. He asked Mr. Woolfolk whether he had any further questions, and Mr. Woolfolk said no. At that point, the traffic stop was complete. Nonetheless, Trooper Morlando went on to ask Mr. Woolfolk whether he had ever been arrested before. Mr. Woolfolk replied that he had only been stopped for traffic and "that sort of thing." When Trooper Morlando asked whether he was sure, Mr. Woolfolk replied that he received an excessive blood alcohol conviction but nothing else. When the trooper again asked whether he was sure, Mr. Woolfolk replied, "No, just traffic."

Because the top to the Corvette was down, Trooper Morlando was able to see clearly into the interior of the vehicle. It was clean, except for a crumpled Kentucky Fried Chicken bag. According to the trooper, the fact that Mr. Woolfolk was still nervous when asked about prior arrests, even though he had received only a warning, coupled with the presence of a crumpled Kentucky Fried Chicken bag on the seat, aroused the trooper's suspicions, so he asked Mr. Woolfolk whether he had anything illegal in his car. Mr. Woolfolk responded that he did not have any weapons in the vehicle. When the trooper asked whether he had any drugs in the car, Mr. Woolfolk "shifted in his seat" but said no. At that point, Trooper Morlando requested Mr. Woolfolk's permission to search his car. Mr. Woolfolk did not consent, stating that he did not want the trooper to "take [his] car apart." Trooper Morlando advised Mr. Woolfolk that he only wanted to search the car and asked him to exit the vehicle so he could explain the situation further.

Once Mr. Woolfolk got out of his car, Trooper Morlando then told him that if he did not consent to a search of the vehicle, that the trooper would "have [Defendant] remain at the scene and [the trooper] would contact the canine unit to come search the vehicle." He positioned Mr. Woolfolk between the two vehicles, and, with Mr. Woolfolk's back against his car, the trooper again requested permission to search the vehicle. Mr. Woolfolk asked whether he should call his attorney, and Trooper Morlando stated that he was free to call an attorney at any time. Mr. Woolfolk repeatedly asserted that he did not want Trooper Morlando taking his car apart, and the trooper repeatedly stated that he just wanted to search it. After several minutes of repeated requests and refusals or questions, Mr. Woolfolk eventually agreed to allow the trooper to search then, rather than wait for the canine unit to come. The search of the vehicle resulted in the seizure of three small, foil-

wrapped cubes of marijuana, and a baggie of green, leafy material that appeared to be marijuana. Mr. Woolfolk was placed under arrest, and transported in the patrol car to the jail. Upon arrival at the jail, Mr. Woolfolk requested to speak with an attorney, and no further questions were asked of Mr. Woolfolk that are relevant here.

Judge Conley denied Mr. Woolfolk's motion to suppress the marijuana. At Mr. Woolfolk's request, the case was submitted for trial to Judge Conley based upon stipulations, Mr. Woolfolk's motion to suppress, his continuing objection to the admission into evidence of the marijuana found in his car, and the transcript of Trooper Morlando's deposition of November 25, 1997. The judge found Mr. Woolfolk guilty, and sentenced him to three years imprisonment in the Missouri Department of Corrections, execution of sentence to be suspended, and five years supervised probation. Mr. Woolfolk appeals.

## II. STANDARD OF REVIEW

■ In our review of the trial court's alleged error in denying the motion to suppress is limited to determining whether there is sufficient evidence to sustain the court's ruling. *State v. Fuente*, 871 S.W.2d 438, 441 (Mo. banc 1994); *State v. Ricketts*, 981 S.W.2d 657, 659 (Mo.App. W.D.1998), *citing, State v. Roberts*, 957 S.W.2d 449, 452 (Mo.App. W.D.1997). When determining the sufficiency of the evidence, we may consider the record made at the pre-trial hearing and the record made at trial. *State v. Collins*, 816 S.W.2d 257, 258 (Mo.App. E.D.1991). We review under an abuse of discretion standard. *State v. Milliorn*, 794 S.W.2d 181, 183 (Mo. banc 1990). The trial court's ruling on a motion to suppress evidence will be affirmed unless it is clearly erroneous. *Id.* If the ruling is plausible, in light of the record viewed in its entirety, we will not reverse, even if convinced we would have weighed the evidence differently. *Id.* at 184. Although we review the facts un-

der a clearly erroneous standard, the issue of whether the Fourth Amendment has been violated is a question of law which we review *de novo*. *State v. Rousan*, 961 S.W.2d 831, 845 (Mo. banc 1998); *Ricketts*, 981 S.W.2d at 659.

## III. Articulable Suspicion Absent Following Completion of Stop

■ Mr. Woolfolk does not challenge the constitutionality of the initial stop. Rather, he asserts that Officer Molando's questioning after the initial stop had concluded constitutes an unlawful seizure in violation of his Fourth Amendment rights.

■ The Fourth Amendment to the United States Constitution guarantees the right of all citizens to be free from unreasonable searches and seizures. U.S. Const. amend. IV. A routine traffic stop based upon the violation of state traffic laws is a justifiable seizure under the Fourth Amendment. *State v. Slavin*, 944 S.W.2d 314, 317 (Mo.App. W.D.1997). "[S]o long as the police are doing no more than they are legally permitted and objectively authorized to do, [the resulting stop or] arrest is constitutional." *Id. Accord, State v. Malaney*, 871 S.W.2d 634, 637 (Mo.App. S.D.1994), *quoting, United States v. Trigg*, 878 F.2d 1037, 1041 (7th Cir.1989).

■ The fact that the police may detain a person for a routine traffic stop does not justify indefinite detention, however. The detention may only last for the time necessary for the officer to conduct a reasonable investigation of the traffic violation. In *State v. Slavin*, we held that such an investigation would properly encompass: 1) asking for the subject's driver's license and registration, 2) requesting that the subject sit in the patrol car, and 3) asking the driver about his or her destination and purpose. 944 S.W.2d at 318. Once these steps have been completed and the officer has checked the driver's record, the officer must allow the driver to proceed without further questioning *unless*

"specific, articulable facts create an objectively reasonable suspicion that the individual is involved in criminal activity." *Id.* *See also State v. Logan,* 914 S.W.2d 806, 808 (Mo.App. W.D.1995). If "the detention extends beyond the time reasonably necessary to effect its initial purpose, the seizure may lose its lawful character unless a new factual predicate for reasonable suspicion is found during the period of lawful seizure." *Slavin,* 944 S.W.2d at 317–318

■ Whether a sufficient new factual predicate for reasonable suspicion exists must be determined based upon the totality of the circumstances. *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981). "Reasonable suspicion must be based upon a specific, articulable set of facts indicating that criminal activity is afoot." *Slavin,* 944 S.W.2d at 318. Moreover, the basis for the reasonable suspicion must arise within the parameters of the traffic stop itself; suspicions based upon answers to questions asked after the stop is completed are irrelevant to the determination of whether specific, articulable facts supported a reasonable suspicion of criminal activity and provided a justification for further questioning once the traffic stop was completed. *Id.* at 318.[1]

Here, it is conceded that the initial traffic stop was completed once the trooper returned Mr. Woolfolk's documents to him and Mr. Woolfolk said he had no further questions. The trooper was required to allow Mr. Woolfolk to go on his way at that point unless specific, articulable facts had developed during the stop which supported a reasonable suspicion of criminal activity, justifying the trooper in detaining Mr. Woolfolk to ask him further questions about the suspicious activity.

Such facts did not exist here at the time the traffic stop was completed. The undisputed facts show that Mr. Woolfolk stopped immediately upon observing the officer's flashing lights and produced all requested documentation upon request. Mr. Woolfolk's license and registration were in order, and no warrants had been issued for his arrest. The only factors cited by Officer Morlando as arousing his suspicions during the traffic stop were Mr. Woolfolk's nervousness and the presence of a Kentucky Fried Chicken bag in an otherwise clean car.

■ Nervousness alone does not give rise to reasonable suspicion, although, together with other factors, it can be relevant in determining whether reasonable suspicion exists under the totality of the circumstances. *State v. Stevens,* 845 S.W.2d 124 (Mo.App. E.D.1993). Similarly, the presence of fast food wrappers in cars is commonplace in highway travel in this era of carry-out dining and cannot serve to separate the suspicious from the innocent traveler. *See, e.g., Karnes v. Skrutski,* 62 F.3d 485, 496 (3d Cir.1995); *State v. Smith,* 926 S.W.2d 689, 693–694 (Mo.App. S.D.1996) (presence of junk food wrappers, water jug and map in car did not create basis for suspicion of criminal activity).

The State argues that, even if the trooper did not have reasonable suspicion to continue to detain Mr. Woolfolk after completion of the traffic stop, nothing prevented the trooper from chatting with the driver, and that if, during that chat, the driver engaged in suspicious activity sufficient to create a reasonable suspicion, then the officer had a right to then detain the driver until the canine unit arrived to search the vehicle, citing *State v. Morr,* 811 S.W.2d 794 (Mo.App. W.D.1991).

---

1. *See also State v. Bevan,* 80 Ohio App.3d 126, 608 N.E.2d 1099 (1992); *State v. Estrada,* 111 N.M. 798, 810 P.2d 817 (1991); *State v. Peterson,* 143 Or.App. 505, 923 P.2d 1340 (1996); *United States v. Elliott,* 107 F.3d 810, 813 (10th Cir.1997); *United States v. Carrate,* 122 F.3d 666, 668 (8th Cir.1997); *United States v. Hunnicutt,* 135 F.3d 1345, 1349 (10th Cir. 1998).

In *Morr*, the officer completed the stop, and admitted that at that point he had no suspicion of any wrongdoing on the part of the defendant. The officer testified, however, that, on that particular day, he had decided to ask everyone he stopped for a traffic infraction whether they "had any drugs or guns or anything in the car." The officer asked defendant if he "had any drugs or guns or knives or anything" in his car, and defendant said "no." The officer then asked defendant whether he could search the vehicle, and defendant said "yes." The search produced marijuana and cocaine. In affirming the trial court's denial of defendant's motion to suppress, this Court stated that, "[t]he officer's query of the defendant, his ensuing request for permission to search defendant's car, and his proceeding to defendant's car for that purpose, were merely officious," *Id.* at 797–98. They did not constitute a detention, since the driver was free to leave.

 *Morr* is consistent with other cases holding that the mere fact that an officer talks with a citizen or asks the citizen a question does not mean that the citizen is being seized or detained. So long as the person is free to leave, the officer can talk to him, and is free to ask whether he has contraband on his person, or in his car, or in his residence. *See Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). This does not mean, however, that an officer is free to involuntarily detain a driver without reasonable suspicion under the guise of simply engaging in a voluntary conversation. Nor may the officer use a driver's refusal to consent to a voluntary request to search a vehicle "as support of the requisite reasonable suspicion to support the search." *Slavin*, 944 S.W.2d at 319.

Here, the State claims that Trooper Morlando was simply engaging in voluntary conversation with Mr. Woolfolk when, after the traffic stop was complete, he struck up a conversation by asking whether Mr. Woolfolk had ever been arrested. This is not a topic most drivers voluntarily talk to police about, however, particularly where, as here, the trooper already knew the answer to his question because he had run a check on Mr. Woolfolk's criminal record. In any event, we disagree with the State that the fact that Mr. Woolfolk did not reveal his prior arrest on marijuana charges, later dismissed, and his nervousness at being asked questions about prior arrests, provided the previously lacking basis for reasonable suspicion. For, as the State argues, the traffic stop was over and Mr. Woolfolk was free to leave or to refuse to answer any questions at all.

It is true that, here, Mr. Woolfolk answered untruthfully by denying he had any such drug arrests. However, the State cannot have it both ways. If the conversation was a voluntary one, such as the driver might be having with a neighbor, the driver was under no legal obligation to truthfully answer questions asking for embarrassing information which the trooper had no official right to ask. The fact that he did not tell the truth should be irrelevant, unless it were considered to be a lie given in the course of a criminal investigation into issues raised by other aspects of the traffic stop. However, as just noted, the State admits that the traffic stop itself was concluded, and we have held that the presence of a Kentucky Fried chicken wrapper and the driver's nervousness did not provide an articulable basis for reasonable suspicion of criminal activity.

For these reasons, we conclude that the trooper did not have reasonable suspicion to search Mr. Woolfolk's car based on his failure to reveal his arrest record, and that no other sufficient basis for reasonable suspicion to support the search existed. If the search is to be justified, it must be on another basis.

### IV. Lack of Voluntary Consent to Search

 The State argues that, even if the search were not justifiable on the basis of

reasonable suspicion, it was justified on the basis that Mr. Woolfolk voluntarily consented to the search. The State argues that Mr. Woolfolk was free to leave when the trooper asked permission to search the car, so that Mr. Woolfolk's consent to search the car was valid because consenting to a search of the car was presented to Mr. Woolfolk as merely an option; another option specifically mentioned by the trooper was to wait while the trooper summoned a drug-sniffing dog, but Mr. Woolfolk could have taken a third option of declining to either allow the search or to wait, and instead leaving. Again, we disagree.

Consent searches are a valid exception to the warrant requirement of the Fourth and Fourteenth Amendments. *State v. Peterson*, 964 S.W.2d 854, 857 (Mo.App. S.D.1998). Probable cause to believe that a vehicle contains contraband is not necessary before an officer is authorized to request permission to search. *Id.* An officer may at any time ask a citizen whether he has contraband in his car and may ask for permission to search; if consent is given without coercion, the subsequent search is not prohibited by the Fourth and Fourteenth Amendments. *Id.* Moreover, *State v. Hyland*, 840 S.W.2d 219, 221 (Mo. banc 1992), expressly rejected any requirement that a suspect must be told he may refuse to consent. "[A]n effective consent to search is not conditional on knowledge of a right to refuse the search." *State v. Scott*, 926 S.W.2d 864, 870 (Mo.App. S.D.1996).

On the other hand, consent is invalid if it is the product of duress or coercion, either express or implied. *State v. Petrone*, 836 S.W.2d 484, 487 (Mo.App. S.D.1992). Voluntariness of the consent is determined by looking at the totality of the circumstances. *State v. Riddle*, 843 S.W.2d 385, 387 (Mo.App. E.D.1992), *citing, Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973). Further, *the State* bears the burden of proving that consent was freely and voluntarily given. *Riddle*, 843 S.W.2d at 387; *Peterson*, 964 S.W.2d at 857. And, the State does not satisfy this burden merely by showing a submission to a claim of lawful authority. *State v. Talbert*, 873 S.W.2d 321, 324 (Mo.App. S.D.1994), *citing, Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229, 236 (1983). If reasonable persons in Mr. Woolfolk's position would believe they were under detention, and not feel free to leave, then the encounter was not consensual. *State v. Kovach*, 839 S.W.2d 303, 311 (Mo.App. S.D.1992).

We recently applied these principles in *State v. Leavitt*, 993 S.W.2d 557 (Mo.App. W.D.1999). Ms. Leavitt was stopped for speeding and asked to produce her driver's license. When she was unable to do so, the officer asked her to step out of the car and empty the contents of her pockets onto the hood of the officer's car. She placed lighters, money, a wallet and a large, locked knife on the car. The officer asked her to remove the remaining item in her pocket, and she did so, but immediately placed the item back in her pocket.

The officer insisted that she take the item, which appeared to be a makeup case, out of her pocket and open it. Ms. Leavitt told him it was just a makeup case, but the officer again told the defendant to "let [him] see it." Reluctantly, she opened the makeup case pursuant to the officer's instructions. The officer noticed the corner of a plastic bag sticking out from underneath a silver disk that presumably held makeup, and told her to give him the case. The bag contained a white, powdery substance later determined to be methamphetamine, and she was arrested. The officer later testified that: 1) defendant was not under arrest when he asked her to remove the makeup case from her pocket; 2) he was not concerned for his safety at that time; 3) he did not ask the defendant for permission to search; and 4) had she refused to empty her pockets, he would not have forced her to do so.

On appeal, we held that the search was not consensual, noting that merely hearing and responding to an officer's request alone does not imply that the response is voluntary or consensual. We reiterated that the State cannot satisfy its burden of proof that the consent was voluntary merely by showing the defendant submitted to a claim of lawful authority, and found that in the case before us Ms. Leavitt was not asked, but ordered, to empty her pockets and give the makeup case to the officer. Under the totality of the circumstances, we concluded that "an objective observer would not conclude that Respondent made a free and unconstrained choice to consent to empty her pockets." *Leavitt*, 993 S.W.2d at 563. *Accord, Talbert*, 873 S.W.2d at 324 (trial court did not err in suppressing marijuana where police stopped bus passenger because he had one day's growth of beard and kept his "large" duffel with him when he got off a bus, and one officer took his claim check and headed for the counter while the other officer asked if he could look in the passenger's duffel bag for drugs, was given permission to do so, and ultimately found marijuana; reasonable person in defendant's position would not have felt free to leave).

 Here, as in *Leavitt* and *Talbert,* a reasonable person in Mr. Woolfolk's position would not have felt free to leave at the time that he allegedly consented to the search of his car. Specifically, Trooper Morlando testified at the suppression hearing that he had repeatedly asked Mr. Woolfolk to allow him to search the car, and Mr. Woolfolk had repeatedly said he did not want the trooper to do so, and that at that point the trooper told Mr. Woolfolk he had to get out of his car. The trooper then placed Mr. Woolfolk so that he was leaning up against the back of his car, stood directly in front of him, and again asked him to consent to a search. At the suppression hearing, the trooper summarized his prior deposition testimony as describing the remainder of their encounter as follows:

A: I told him that, . . . what I told him was that one of two things could happen. If you chose that you don't want me to search your car, then what I will do is I'll go back and call the canine unit and have the canine unit come down, that is correct.

Trooper Morlando then reaffirmed this testimony at the suppression hearing:

Q: Trooper, what if any options did you give the defendant regarding the search or the canine unit? What did you tell him?

A: . . . When I, when we first exited the vehicle and were speaking behind the vehicles, *I said to him that if he didn't want me to search the vehicle, then what I would do is I would have him remain at the scene and I would contact the canine unit to come search the vehicle.*

(emphasis added). As is evident, the trooper's own description of the incident shows that, when Mr. Woolfolk repeatedly indicated he did not want the trooper to search the car, he required Mr. Woolfolk to get out of his car and told him that he had two, not three, options: he could either allow the search, or he could wait for the canine unit to search. While the officer may not have an obligation to affirmatively tell a driver he is free to go, where, as here, he tells the driver that his only two options are to allow a search or to wait for a canine unit, he has effectively told the driver he is not free to go. As a result, a reasonable person in Mr. Woolfolk's position would not have felt free to leave.

For these reasons, as in Leavitt, we find that Mr. Woolfolk's alleged consent to search his car was merely a submission to lawful authority, and as such could not support the search in the absence of a basis for reasonable suspicion. The court should have granted the motion to suppress and should not have considered the evidence seized during the search. In the absence of the seized evidence, there was

insufficient evidence to support the conviction. Accordingly, we reverse.

Judge HAROLD L. LOWENSTEIN and Judge JAMES M. SMART, Jr. concur.