

# In the Missouri Court of Appeals
# Eastern District

## DIVISION ONE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED101785 |
| | ) | |
| Appellant, | ) | Appeal from the Circuit Court |
| | ) | of Cape Girardeau County |
| vs. | ) | |
| | ) | Honorable William L. Syler |
| CHARLES A. SELVY, JR., | ) | |
| | ) | |
| Respondent. | ) | Filed: April 7, 2015 |

The State of Missouri brings this interlocutory appeal after the trial court sustained defendant Charles A. Selvy Jr.'s motion to suppress physical evidence found in a search during a traffic stop.[1] We affirm. The traffic stop and resulting search were unlawful in that the stop extended longer than necessary, without reasonable suspicion to justify extending the stop, and the consent given by Mr. Selvy was not voluntarily given. The trial court, therefore, did not clearly err in sustaining the motion and suppressing the evidence.

### *Factual and Procedural Background*

Under the standard by which we review a trial court's order suppressing evidence, we view the facts and the reasonable inferences from those facts in the light most favorable to the trial court's ruling. The State acknowledges this standard, but then fails to apply it in bringing this appeal. Adopting the correct vantage point, we recount the circumstances of the traffic stop.

---

[1] Section 547.200.1(3) RSMo authorizes the State to appeal from an order suppressing evidence.

We begin by noting that the entirety of the traffic stop was recorded and subsequently viewed by the trial court before ruling on the Motion to Suppress.

Trooper Matthew Lomedico, of the Missouri State Highway Patrol, was on patrol one afternoon on the south side of Cape Girardeau in his fully-marked police car. Trooper Lomedico was not conducting a routine traffic patrol, rather he was part of a task force "looking for drugs" and conducting directed patrols to combat violent crimes and narcotic distribution on the south side of Cape Girardeau. Trooper Lomedico observed a car drive past him that displayed a rear Missouri license plate but not a front license plate. He activated his overhead lights, to pull the car over. Trooper Lomedico did not have to activate his siren, as the offending car immediately pulled over to the side of the road. Trooper Lomedico had "no problems" getting the car to stop. Once stopped, Trooper Lomedico, dressed in full uniform, with gun, exited his car and approached the offending car. He observed two men in the car – the driver, defendant Selvy, and a male passenger sitting in the front passenger seat. As Trooper Lomedico approached the car, he did not smell any marijuana. He did not see any drugs or alcohol. Indeed, Trooper Lomedico acknowledged at the suppression hearing, that he did not see anything illegal except the absence of a front license plate. Trooper Lomedico further testified that neither Mr. Selvy nor his passenger appeared to be under the influence of any drugs or alcohol.

Trooper Lomedico informed Mr. Selvy of the reason for the traffic stop, and asked him where his front license plate was. Mr. Selvy responded that he did not know, as it was his sister's car. Upon request, Mr. Selvy and the passenger immediately produced their identification for Trooper Lomedico. Mr. Selvy also produced his insurance papers. Neither Mr. Selvy nor the passenger tried to hide their identities. When Trooper Lomedico got the

2

passenger's identification, he read the passenger's name, "Brian Harris," out loud while standing next to the lowered driver's side window, with Mr. Selvy still sitting in the driver's seat.

Trooper Lomedico next asked Mr. Selvy to come sit in his patrol car. Selvy exited his car, and when asked, denied having a weapon on him. Mr. Selvy then consented to a pat-down prior to getting into the patrol car. Upon giving his consent, Mr. Selvy extended his arms out, so that Trooper Lomedico could perform the pat-down. Trooper Lomedico instead ordered Mr. Selvy to lean over and place his hands on the hood of the patrol car. Trooper Lomedico took one minute to perform the pat-down, and largely focused on Selvy's pants pockets. Trooper Lomedico found nothing illegal on Selvy. He did not find any drugs, and he found no weapon. Trooper Lomedico acknowledged at the hearing that Selvy was cooperative. The audiovisual recording reveals that Selvy answered all of Trooper Lomedico's questions, and that he made eye contact with the trooper when speaking to him.

With the pat-down completed, Trooper Lomedico and Mr. Selvy took their respective places in the patrol car. Trooper Lomedico sat in the driver's seat, where he began entering information into his laptop computer, in order to complete a records check of both men and so that the computer could print out the ticket. Mr. Selvy sat in the front passenger seat. The audiovisual recording shows that Selvy just sat in his seat, looking straight ahead. He did not fidget or make any other sudden or involuntary moves. Occasionally, he turned his head to look out the passenger-side window, and on occasion, when a car passed by, he turned his head to look out the driver's side window. He also occasionally looked in the direction of the computer, which was mounted in the front seat of the patrol car, between Selvy and Trooper Lomedico. Mr. Selvy responded to all of Trooper Lomedico's questions.

3

Trooper Lomedico, motioning towards Selvy's car, where the passenger was still sitting, asked Mr. Selvy, "How do you know him?" Selvy responded, "He's a family friend." Despite the fact that Trooper Lomedico had the passenger's identification – it was sitting in front of him on the computer keyboard – and despite the fact that Trooper Lomedico had previously spoken the passenger's name out loud, and despite the fact that he knew Mr. Selvy knew all this, Trooper Lomedico nevertheless asked, "What's his name?" Mr. Selvy leaned toward the computer, and with a slight smirk on his face, responded, "Brian Harris, I guess." He then pointed to the identification and said, "Right here, what it says on the id. He's just a family friend." Selvy then stated that he was giving the passenger a ride home.

Trooper Lomedico remarked that Selvy had "hesitated" when answering, and asked Selvy, "You know what I mean?" Mr. Selvy shook his head and said "No." For the next three minutes, Trooper Lomedico continued working on his computer. Except for asking Mr. Selvy how old he was and if he had ever been arrested, Trooper Lomedico worked in silence. Selvy answered Trooper Lomedico's questions and looked at the trooper when doing so. Trooper Lomedico then abruptly told Selvy to "sit tight." He then exited the patrol car and approached the passenger side of Selvy's car. He asked the passenger to step out of the car. The passenger complied. Trooper Lomedico asked the passenger his name, and asked where he and Mr. Selvy were going. Consistent with the identification, the passenger said he was Brian Harris. And consistent with Selvy's explanation, the passenger stated that Mr. Selvy was giving him a ride home. Trooper Lomedico told the passenger to have a seat back in the car, which he did.

Trooper Lomedico returned to the passenger side of his patrol car, opened the door, and asked Mr. Selvy to get out of the car. Selvy complied. Once standing outside the car, Trooper Lomedico asked Mr. Selvy, "So, what's going on tonight?" Trooper Lomedico then began

4

asking Selvy for consent to search his car. Selvy said no, to which Trooper Lomedico asked, "Why don't you want me to search?" Trooper Lomedico then stated, "Why not?" Selvy responded, "I just don't." Trooper Lomedico sarcastically repeated Selvy's answer, saying, "You just don't." He then asked, "Am I going to have to call a canine?" and then "I can call a canine." Selvy again responded, "I don't want you to search." Trooper Lomedico again echoed Selvy's response, saying, "You don't want me to." He then ordered Selvy to sit on the curb next to the patrol car. Mr. Selvy complied.

At this point, the passenger, Mr. Harris, called out the window to Trooper Lomedico, remarking that they had given the trooper their identification. Trooper Lomedico walked back to the passenger side of Selvy's car, to talk to Mr. Harris. Trooper Lomedico explained that he was asking Mr. Selvy to give his consent to a search of the vehicle, but that Selvy was refusing to give that consent. Mr. Harris remarked that it was not his vehicle. Trooper Lomedico said he knew that, and then asked if Mr. Harris had anything on him. Mr. Harris said no. Trooper Lomedico then asked if anything was in the car. Mr. Harris stated he did not know, and again stated that it was not his car. Trooper Lomedico stood in place for a short time and then turned and walked slowly back to Mr. Selvy sitting on curb. While other times Trooper Lomedico took only six seconds to walk from one car to the other, this time Trooper Lomedico took 12 seconds – double the time – to walk from one car to the other. Once back at his car, Trooper Lomedico stood over Mr. Selvy, hoisted up his weapon belt, crossed his arms, and stared down at Mr. Selvy on the curb without speaking. Trooper Lomedico stared at Selvy in silence for at least twelve seconds. He then told Selvy, "Last chance, man." It was at this point that Selvy consented to a search of his car. That search revealed a bag on the backseat that contained crack and powder

cocaine, hallucinogenic mushrooms, and marijuana. Trooper Lomedico placed Mr. Selvy under arrest.

The State charged Mr. Selvy with four counts of the class B felony of possession of a controlled substance with intent to distribute, in violation of Section 195.211 RSMo., and one count of the class A misdemeanor of possession of drug paraphernalia, in violation of Section 195.233. Selvy claimed that the search and seizure violated his rights under the United States and Missouri Constitutions, and that his consent was not voluntary or understandingly and knowingly given. He thus moved to suppress all evidence seized as a result of the search.

At the hearing on Selvy's motion, Trooper Lomedico testified that he thought Selvy may be participating in criminal activity because of Selvy's excessive nervousness, the way in which Selvy answered questions and interacted with him, Selvy's answers regarding the identity of his passenger, and because they were in a high-crime area known for drug movement.

Trooper Lomedico described Selvy as being "extremely nervous." He stated that the degree of nervousness on Selvy's part far exceeded that exhibited on a "normal" traffic stop. He also noted that Selvy did not talk much, but rather answered in one- or two-word answers. He further noted that Selvy mumbled, that he would not look at him, and that he made no eye contact with him when he spoke. Trooper Lomedico explained that the main reason he had Selvy exit the car and sit in the patrol car was because of Selvy's nervousness and because Selvy would not talk to him. Trooper Lomedico described the stop as "odd," and stated he "knew something suspicious was going on."

Trooper Lomedico testified that Mr. Selvy's extremely nervous behavior continued when they were sitting in the patrol car. He remarked that Mr. Selvy stared straight ahead, that he did not talk very much, and that if asked a question, Selvy made "very, very short comments, very

6

short statements." Trooper Lomedico also remarked that Selvy was breathing heavily, and "stuff like that." Trooper Lomedico conceded that he had never met Mr. Selvy before He did not know if Mr. Selvy normally mumbled. He did not know if Mr. Selvy generally did not speak much. And he did not know whether Mr. Selvy normally maintained eye contact when he spoke.

Trooper Lomedico, in justifying his detention of Mr. Selvy, also pointed to Mr. Selvy's answers about the passenger. He complained that Selvy hesitated and gave conflicting statements. He said he became further suspicious that "something was not right" when Mr. Selvy answered "family friend." Trooper Lomedico agreed at the hearing that Selvy's response was not unreasonable. He also acknowledged that Selvy knew he had the passenger's identification directly in front of him, and that he had previously spoken the passenger's name out loud. Nevertheless, he insisted that he became suspicious that Selvy and the passenger were engaged in something illegal when he asked Selvy "what's his name," and Selvy replied that he "didn't know." Trooper Lomedico said that Selvy's answers were "huge." In his view, Selvy should have told him who the passenger was. We note that the recording belies this testimony. Selvy never stated that he "didn't know" the passenger's name.

At the conclusion of the hearing, after hearing testimony and viewing the audiovisual recording, the trial court made the following observations about Mr. Selvy's demeanor during the stop:

> My impression frankly of the defendant's demeanor in the vehicle was not particularly being nervous. It looked like he may have been stoned, in all honesty, but I don't think he was particularly nervous.

The trial court stated it had trouble justifying the search, and granted defendant's motion. The State on appeal contends that both the stop and search were permissible and passed constitutional muster, and therefore the trial court erred in suppressing the evidence, because: (1) the stop did

not exceed the time necessary for Trooper Lomedico to conduct a reasonable investigation of the traffic violation; (2) Trooper Lomedico had reasonable suspicion to further detain Mr. Selvy; and (3) Mr. Selvy's consent to search his car was valid.

## *Standard of Review*

The State bears the burden of showing by a preponderance of the evidence that a motion to suppress should be denied. Section 542.296.6; *State v. Franklin*, 841 S.W.2d 639, 644 (Mo. banc 1992); *State v. Avent*, 432 S.W.3d 249, 252 (Mo. App. W.D. 2014). In ruling on a motion to suppress, the trial court may believe or disbelieve all or any part of the testimony presented by the State, even if uncontradicted, and the court may find that the State failed to meet its burden of proof. *Avent*, 432 S.W.3d at 252.

We review the trial court's decision to grant a motion to suppress under an abuse-of-discretion standard. *State v. Milliorn*, 794 S.W.2d 181, 183 (Mo. banc 1990); *Avent*, 432 S.W.3d at 252. We will reverse only if the trial court's decision is clearly erroneous. *Id.* Our review is limited to determining whether the trial court's decision is supported by substantial evidence. *State v. Stover*, 388 S.W.3d 138, 149 (Mo. banc 2012); *Avent*, 432 S.W.3d at 252. In so reviewing, we view the facts and any reasonable inferences from those facts in the light most favorable to the trial court's ruling. *State v. Johnson*, 354 S.W.3d 627, 631-32 (Mo. banc 2011); *Avent*, 432 S.W.3d at 252. We disregard any evidence and inferences contrary to the court's ruling. *Johnson*, 354 S.W.3d at 632; *Avent*, 432 S.W.3d at 252.

Where, as here, the trial court makes no findings of fact in ruling on the motion to suppress, we presume the trial court found all facts in accordance with its ruling. *Avent*, 432 S.W.3d at 252. We deem that the trial court implicitly found not credible, or entitled to little to no weight, any testimony or other evidence that does not support its ruling. *Id.* at 253.

8

It is not for this Court to reweigh the evidence. *Avent*, 432 S.W.3d at 257. Rather, the weight of the evidence and the credibility of the witnesses are for the trial court's determination. *Id.* at 252. And we defer to those credibility determinations. *Id.* "It is not this Court's province to substitute its discretion for that of the trial court, but instead from the record before us which encompasses all the circumstances, the total atmosphere of the case, we must decide only whether there was adequate evidence to support the trial court's action." *Id.* at 257. If the trial court's ruling is plausible, in light of the record viewed in its entirety, we will not reverse. *Milliorn*, 794 S.W.2d at 184; *Avent*, 432 S.W.3d at 253.

Although this Court may not substitute its discretion for that of the trial court, this Court must nevertheless consider the order suppressing evidence in light of the proper application of the precepts of the Fourth Amendment. *State v. Stoebe*, 406 S.W.3d 509, 515 (Mo. App. W.D. 2013). The ultimate issue of whether the Fourth Amendment was violated is a question of law that this Court reviews *de novo*. *Id.* "[W]hether a search is permissible and whether the exclusionary rule applies to evidence obtained through that search, are questions of law that we review *de novo*." *State v. Ellis*, 355 S.W.3d 522, 523 (Mo. App. E.D. 2011); *Johnson*, 354 S.W.3d at 631-32.

## Discussion

This case, like many other traffic-stop cases, involves the inevitable tension between the efforts of law-enforcement officers to enforce drug laws and an individual's constitutional right to be free from unreasonable searches and seizures. *State v. McNeely*, 358 S.W.3d 65, 69 (Mo. banc 2012); *State v. Vogler*, 297 S.W.3d 116, 119 (Mo. App. S.D. 2009).

The Fourth Amendment to the United States Constitution guarantees citizens the right to be free from unreasonable searches and seizures. *Stover*, 388 S.W.3d at 149; U.S. Const. amend.

9

IV.[2] To be lawful under the Fourth Amendment, a search and seizure must be reasonable, meaning that the search and seizure must be based on probable cause and executed pursuant to a warrant. *State v. Gantt*, 87 S.W.3d 330, 332 (Mo. App. W.D. 2002). Warrantless searches and seizures are *per se* unreasonable and therefore unconstitutional unless the search and seizure falls within a specific, well-established and narrowly-delineated exception. *Ellis*, 355 S.W.3d at 523-24.

Mr. Selvy does not challenge the legality of the initial traffic stop. Indeed, failure to display a front license plate violates Missouri law. Section 301.130.5; *State v. Shaw*, 81 S.W.3d 75, 78 (Mo. App. W.D. 2002).[3] And a routine traffic stop based on the violation of state traffic laws is a justifiable seizure under the Fourth Amendment. *State v. Granado*, 148 S.W.3d 309, 311 (Mo. banc 2004). Such a seizure is constitutional so long as the police are doing no more than they are legally permitted and objectively authorized to do. *Id.* "The period of lawful seizure for a traffic stop encompasses that time during which the officer may conduct a reasonable investigation of the traffic violation." *State v. Slavin*, 944 S.W.2d 314, 318 (Mo. App. W.D. 1997). "A reasonable investigation of a traffic violation may include asking for the driver's license and registration, requesting the driver to sit in the patrol car, and asking the

---

[2] Specifically, the Fourth Amendment to the United States Constitution provides: "The right of the people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated...." The Fourteenth Amendment to the United States Constitution renders the Fourth Amendment applicable to state action. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961). The Missouri Constitution also protects individuals from unreasonable searches and seizures. Article I, section 15 of the Missouri Constitution provides: "That the people shall be secure in their persons ... from unreasonable searches and seizures...." The protections against unreasonable search and seizures guaranteed by the Missouri Constitution are parallel to, and coextensive with, those of the Fourth Amendment to the United States Constitution; thus any analysis of search and seizure questions under the Fourth Amendment is identical to analysis of search and seizure questions arising under Missouri law. *State v. Oliver*, 293 S.W.3d 437, 442 (Mo. banc 2009); *State v. Damask*, 936 S.W.2d 565, 570 (Mo. banc 1996).

[3] Subject to certain exceptions not applicable here, Section 301.130 of Missouri's Revised Statutes requires that "[n]o motor vehicle ... shall be operated on any highway of this state unless it shall have displayed thereon the license plate or set of license plates issued by the director of revenue ..." and that the plates be fastened "on the front and rear" of the motor vehicle. Section 301.130.5 RSMo. Failure to comply with Section 301.130 is a misdemeanor offense. *State v. Shaw*, 81 S.W.3d 75, 78 (Mo. App. W.D. 2002); Section 301.440 (providing that a violation of Section 301.130 is punishable by "a fine of not less than five dollars or more than five hundred dollars."

10

driver about his destination and purpose." *State v. Barks*, 128 S.W.3d 513, 516 (Mo. banc 2004)(internal quotation omitted). However, the fact that a police officer may lawfully detain a person for a routine traffic stop does not justify indefinite detention. *Barks*, 128 S.W.3d at 516. The detention may only last for the time necessary for the officer to conduct a reasonable investigation. *Id.* A lawful seizure may become unconstitutional if the detention lasts beyond the time necessary to effect its initial purpose. *See Barks*, 128 S.W.3d at 517; *Granado*, 148 S.W.3d at 311-12; *Stover*, 388 S.W.3d at 149; *Slavin*, 944 S.W.2d at 317-18.

The State contends that the traffic stop here did not constitute an impermissible seizure under the Fourth Amendment because the detention did not exceed the average time of a routine traffic stop or the time required for Trooper Lomedico to conduct a reasonable investigation of the traffic violation. The State cites Trooper Lomedico's testimony that a routine traffic stop normally takes between ten and fifteen minutes to complete. The State then points to the fact when Mr. Selvy gave his consent to a search of his car, only fifteen minutes had elapsed, during which time Trooper Lomedico had asked routine questions, conducted computer checks of Mr. Selvy and his passenger, and initiated steps to issue the citation. Of course, the trial court was free to reject Trooper Lomedico's testimony. But moreover, the State apparently argues, without offering any authority, that a traffic stop passes constitutional muster merely because of the length of time that has elapsed. We reject this argument. It is the events and circumstances surrounding a stop that inform a Fourth Amendment analysis, not merely the minutes that have elapsed.

In determining whether a traffic stop extends too long to be justified as investigatory, courts "examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the

11

defendant." *Stover*, 388 S.W.3d at 149 (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)). Trooper Lomedico diligently pursued his investigation at first, but then he abandoned that investigation. There was little to investigate regarding the initial traffic stop. Trooper Lomedico pulled Selvy over because he was missing a front license plate. He inquired about the license plate immediately upon approaching Selvy's car, and Mr. Selvy all but admitted that he did not have that license plate, when he acknowledged that he did not know where the plate was, because it was his sister's car. Trooper Lomedico also promptly asked for identifications. He promptly asked Mr. Selvy to come sit in the patrol car. And once inside the patrol car he immediately began conducting his computerized records check of the car, Mr. Selvy, and the passenger, Mr. Harris. Trooper Lomedico testified that those checks came back clear. Neither Mr. Selvy nor Mr. Harris had outstanding warrants, and Mr. Selvy had a valid license.[4] It is not entirely clear from the record when Trooper Lomedico learned this information. It is reasonable to infer that it was before Trooper Lomedico told Mr. Selvy to "sit tight," and then exited his patrol car to speak with Mr. Harris. Trooper Lomedico never returned to the inside of his patrol car prior to arresting Selvy. What is clear, is that once Trooper Lomedico spoke with Mr. Harris to confirm his identity, he spent the next four minutes trying to obtain consent to search Mr. Selvy's car. Trooper Lomedico never returned to the patrol car to effect his initial purpose – issuing a citation for a missing license plate – and bring the traffic stop to a conclusion. Instead, he set about to get permission to search Selvy's car. He had abandoned the initial purpose of the traffic stop. Trooper Lomedico admitted at the suppression hearing that by the time he started asking permission to search Selvy's car, he "wasn't worried" about the traffic ticket any more. He contended he had grounds to believe that criminal activity was afoot. In his view, "something was not right."

---

[4] Mr. Harris's identification was a non-driver's license identification.

12

True, law-enforcement officers may detain an individual beyond the time period necessary to investigate the traffic violation if the officer develops "reasonable and articulable grounds for suspicion of illegal activity based on the behavior and responses of the individual during the traffic stop." *Stover*, 388 S.W.3d at 149. Absent those grounds, however, once the officer has completed a reasonable investigation of the traffic violation, and the purpose of the traffic stop is completed, the officer must allow the person detained to proceed. *See, e.g., Granado*, 148 S.W.3d at 311; *Slavin*, 944 S.W.2d at 318. The basis for a reasonable suspicion of criminal activity must arise within the parameters of the traffic stop itself. *Barks*, 128 S.W.3d at 517. Reasonable suspicion, sufficient to justify prolonged detention, arises when an officer observes unusual conduct that leads the officer to reasonably conclude in light of the officer's experience that criminal activity may be afoot. *Stover*, 388 S.W.3d at 149. Courts evaluate the totality of the circumstances in evaluating whether an officer had the requisite reasonable suspicion of criminal activity to justify prolonging the detention. *Id.* Courts can consider a detainee's nervousness in determining whether reasonable suspicion exists, but nervousness alone, even if excessive, does not provide the reasonable suspicion necessary for further detention. *Barks*, 128 S.W.3d at 517; *State v. Weddle*, 18 S.W.3d 389, 394 (Mo. App. E.D. 2000); *Slavin*, 944 S.W.2d at 320. And the officer must be able to articulate "more than just an inchoate and unparticularized suspicion or hunch" to prolong the detention. *Slavin*, 944 S.W.2d at 318-20; *Weddle*, 18 S.W.3d at 394.

Trooper Lomedico justified continued detention of Mr. Selvy based on Selvy's nervousness, his lack of eye contact, his mumbling, his short answers, his heavy breathing, his answers about the passenger, and his presence in a high-crime area. After viewing the audiovisual recording, the trial court remarked that Mr. Selvy did not look particularly nervous.

13

The recording confirms the trial court's observations, and its implicit finding that Trooper Lomedico lacked reasonable suspicion to further detain Mr. Selvy. Selvy did not look "excessively nervous." He was not breathing heavily, as Trooper Lomedico asserted. He did not appear particularly anxious. He sounded and appeared cooperative. He was not upset or discouraged about being stopped. His answers, though short, were appropriate to the questions asked. He never stated that he "didn't know" the passenger's name, as Trooper Lomedico insisted. His explanation that he was giving the passenger a ride home was consistent – not conflicting – with the explanation provided by Mr. Harris, the passenger. And it is reasonable to infer that Selvy was merely being sarcastic in answering Trooper Lomedico's questions about the passenger, given that Trooper Lomedico had the passenger's identification right in front of him when he asked the question and had previously recited the passenger's name.

The State, in hindsight, asserts that Trooper Lomedico had reasonable suspicion to further detain Selvy on grounds that Selvy appeared to be driving an automobile while intoxicated.[5] The State did not advance this argument to the trial court. Nevertheless, to support this assertion, the States cites the trial court's remark at the conclusion of the suppression hearing that "[i]t looked like he [Selvy] may have been stoned ...." The State argues that Selvy's intoxicated behavior alone provided Trooper Lomedico with reasonable suspicion to believe that Selvy was transporting drugs or that drugs would be found inside the car. In the State's view, it was reasonable for Trooper Lomedico to further detain Selvy given Selvy's intoxicated behavior, his conflicting statements, and the fact that he was in a high-crime area specifically known for extensive drug movement.

---

[5] Section 577.010.1 declares that a person commits the crime of driving while intoxicated if he operates a motor vehicle while in an intoxicated or drugged condition.

14

We reject this argument. To begin, the trial court's comment does not amount to a finding of fact that Selvy operated the car in a drugged condition. Saying that something "may" be the case expresses a possibility, not a probability. We conclude that the court's comment amounted to nothing more than a gratuitous statement, which we disregard. *Avent*, 432 S.W.3d at 256 (noting "gratuitous oral statements made by the trial court are to be disregarded by this Court entirely unless there is an ambiguity in the language of the written judgment or order"); *see also Harvey v. Dir. of Rev.*, 371 S.W.3d 824, 828 (Mo. App. W.D. 2012)(noting "we typically disregard a trial court's oral statements made in ruling on an issue. Such statements are not part of the trial court's order or judgment and may be considered only as an explanation of the order or judgment."); *see also State v. Rodgers*, 260 S.W.2d 736, 740 (Mo. 1953)(noting that the trial court's judgment "may not be based upon mere speculation and conjecture...."). Moreover, Trooper Lomedico's suspicion was not that Selvy was operating the motor vehicle while drugged, it was that he was transporting drugs. If Trooper Lomedico was concerned that Mr. Selvy was driving while intoxicated or under the influence of drugs, the reasonable response would have been to perform field sobriety tests. *Weddle*, 18 S.W.3d at 395. Yet, Trooper Lomedico performed none. Instead, he sought to search the car, an action that would provide little assistance in an investigation of the offense of driving while intoxicated or driving under the influence of drugs. *Id.* Furthermore, the State's argument is completely contradicted by Trooper Lomedico's testimony and the observations he made during the stop. Trooper Lomedico specifically testified that neither Mr. Selvy nor Mr. Harris seemed to be under the influence of any drugs or alcohol. We evaluate reasonable suspicion based on an objective assessment of the officer's actions in light of the facts known to him at the time. *State v. Kelly*, 119 S.W.3d 587, 594 (Mo. App. E.D. 2003). And at the time, in Trooper Lomedico's view, Mr.

15

Selvy did not seem intoxicated. The State has not carried its burden of justifying the prolonged detention based on this ground.

We conclude that Trooper Lomedico did not have a reasonable, articulable basis for suspicion of criminal activity to prolong the traffic stop. Mr. Selvy was unlawfully detained.

We turn lastly to Selvy's consent. The State asserts that the search of Mr. Selvy's car was not impermissible under the Fourth Amendment because Selvy voluntarily consented to the search.[6]

As a general rule, a search conducted outside of the judicial process, without prior approval by a judge or magistrate, is *per se* unreasonable and violates the Fourth Amendment. *McNeely*, 358 S.W.3d at 68-69 (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). However, a few specifically-established and well-delineated exceptions to warrant requirement of the Fourth Amendment exist, one of which is the consensual-search exception. *Id.*; *State v. Mathis*, 204 S.W.3d 247, 258 (Mo. App. E.D. 2006). A warrantless search pursuant to consent voluntarily given is valid under the Fourth Amendment. *State v. Hyland*, 840 S.W.2d 219, 221 (Mo. banc 1992); *Mathis*, 204 S.W.3d at 258. "An officer may at any time ask a citizen whether he has contraband his car, and may ask for permission to search." *State v. Woolfolk*, 3 S.W.3d 823, 831 (Mo. App. W.D. 1999). The citizen may deny consent, and if he does, the officer may not conduct the search. *See State v. Morr*, 811 S.W.2d 794, 798 (Mo. App. W.D. 1992). But if the citizen voluntarily gives his or her uncoerced consent, the subsequent search is not prohibited by the Fourth Amendment. *Hyland*, 840 S.W.2d at 221; *State v. Peterson*, 964 S.W.2d 854, 857-58 (Mo. App. S.D. 1998); *State v. Bunts*, 867 S.W.2d 277, 281 (Mo. App. S.D. 1993); *Morr*, 811

---

[6] A non-owner driver of a vehicle has sufficient authority to grant valid consent to search the vehicle. *State v. Hindman*, 446 S.W.3d 683, 687 (Mo. App. W.D. 2014).

16

S.W.2d at 799. On the other hand, if the consent is the product of duress or coercion, either express or implied, then the consent is invalid. *Woolfolk*, 3 S.W.3d at 831-32.

When the State relies on consent to justify a search, the State has the burden of proving the consent was freely and voluntarily given. *Id.* The State does not satisfy this burden merely by showing a submission to a claim of lawful authority. *Id.* Voluntariness of the consent is determined by looking at the totality of the circumstances. *Id.* Consent is freely and voluntarily given if, considering the totality of the circumstances, the objective observer would conclude that the person giving consent made a free and unconstrained choice to do so. *Hyland*, 840 S.W.2d at 222. "This determination involves a consideration of a number of factors, including, but not limited to, the number of officers present, the degree to which they emphasized their authority, whether weapons were displayed, whether the person was already in custody, whether there was any fraud on the part of the officers, and the evidence of what was said and done by the person consenting." *Mathis*, 204 S.W.3d at 258.

We agree with the trial court's conclusion that Selvy's consent was not voluntarily given. Trooper Lomedico was in full uniform, with a gun. He emphasized his authority. He conducted a long pat-down. He ordered Selvy to sit on the curb. He spent four minutes trying to obtain consent. He repeatedly asked for consent and peppered Selvy with questions when Selvy denied the requests. He threatened to call in a canine. He walked slowly back to Selvy, hoisted his gun belt, then stood over Mr. Selvy in silence, staring down at him for twelve seconds. He then told Selvy "[l]ast chance, man." Despite the fact that Selvy repeatedly stated that he did not want Trooper Lomedico to search the car, Trooper Lomedico persisted in his requests and made it clear that he was not going to take no for an answer. Under these circumstances, the trial court

17

could reasonably conclude that Selvy did not make a free and unconstrained choice. Rather, the trial court could find that Selvy was implicitly coerced.

The State claims that Selvy gave in to his passenger's encouragement. This argument again ignores the applicable standard of review. The trial court did not have to believe Trooper Lomedico's testimony that this occurred and we disregard the testimony. Moreover, the audiovisual recording reveals no encouragement whatsoever by the passenger. In fact, the recording reveals no communication at all between the passenger and Mr. Selvy from the time Selvy exited his car and the time he gave consent to search the car. All that can be heard is Mr. Harris expressing his displeasure at Trooper Lomedico's prolonged detention of him and Mr. Selvy despite having given the trooper their identification.

### Conclusion

In sum, we hold that the trial court's decision is supported by substantial evidence and that the court correctly concluded that Mr. Selvy's constitutional rights had been violated, requiring suppression of the evidence. The traffic stop extended beyond time reasonable to investigate the traffic violation. The State failed to show that Trooper Lomedico had reasonable suspicion of criminal activity, sufficient to extend the stop. And Selvy's consent was not voluntarily given. The search and seizure here violated Mr. Selvy's Fourth Amendment rights. The evidence sought to be suppressed was discovered as a direct and immediate result of Selvy's illegal detention and involuntary consent. That evidence must then be excluded as fruit of the poisonous tree. *State v. Sund*, 215 S.W.3d 719, 725 (Mo. banc 2007). The trial court therefore did not clearly err in sustaining Mr. Selvy's motion and suppressing the evidence found as result of the search of Selvy's car. We affirm.

_____
LAWRENCE E. MOONEY, PRESIDING JUDGE

18

CLIFFORD H. AHRENS, J., and
LISA VAN AMBURG, J., concur.