

# SUPREME COURT OF MISSOURI
## en banc

STATE OF MISSOURI,           )
                             )
            Respondent,      )
                             )
v.                           )      No. SC100469
                             )
CHAD J. THOMAS,              )
                             )
            Appellant.       )

*Opinion issued November 5, 2024*

### APPEAL FROM THE CIRCUIT COURT OF SALINE COUNTY
**The Honorable Dennis Allen Rolf, Judge**

Chad Thomas appeals the circuit court's judgment convicting him of possession of a controlled substance, section 579.015, and unlawful possession of drug paraphernalia, section 579.074.[1]  He argues the court erred in overruling his motion to suppress evidence that was discovered during a traffic stop.  He contends the evidence was the result of an unlawful search because the officer extended the traffic stop without reasonable suspicion to do so.  Because the totality of the circumstances surrounding the officer's encounter with Thomas gave the officer reasonable suspicion to continue to detain Thomas, this Court affirms the circuit court's judgment.

_____

[1] All statutory references are to RSMo 2016.

**Background**

In the early morning hours of a winter day, a police officer pulled Thomas over for driving with a broken headlight. The officer walked up to the passenger side of Thomas's vehicle and asked him to roll down his window. Thomas first rolled down the rear passenger window. When asked to roll down the front passenger window, Thomas rolled it down a few inches. The officer explained the reason for the stop and asked Thomas for his driver's license. Thomas began to search for his license in his wallet but said he could not find it. The officer then asked Thomas to exit the vehicle. After Thomas complied, the officer asked his permission to conduct a pat-down search. Thomas consented. As he patted down Thomas's pockets, the officer felt a bulge and asked Thomas what it was. Thomas responded that he was not sure, but it might be a "sharp."[2] Thomas then stated he sometimes carries a knife. The officer called for backup and asked multiple times if he could reach into Thomas' pocket and retrieve the object. Thomas first declined but later consented, allowing the officer to look into his pocket. The officer confirmed the bulge was a key fob in Thomas' pocket.

The officer asked Thomas to come back to his patrol vehicle and sit in the passenger seat, but Thomas refused. During this exchange, the officer noticed Thomas was speaking rapidly and sweating even though it was cold outside, he was sweating. He told Thomas he seemed overly nervous and was talking very fast as Thomas continued to search for his driver's license. Thomas told the officer his driver's license was in the

---

[2] The officer explained, due to his training and experience, he knew a "sharp" to be a hypodermic needle.

vehicle. The officer allowed Thomas to go back into his vehicle to retrieve it. While Thomas was opening his door, he explained he did not feel safe sitting in the officer's vehicle because he previously had been beaten up by police.

As Thomas sat back in his driver's seat, he put his hand up and said "excuse me," attempting to close the door. The officer ordered Thomas out of the vehicle and told Thomas he had allowed him to go back into the vehicle only to retrieve his license, not wanting him to close the door. Thomas then reached over toward the center console. With this movement, Thomas blocked the officer's vision of the center console, where Thomas was placing his hands. This also prevented the officer from seeing what he was reaching for. The officer then grabbed Thomas' shoulder and wrist, instructed him to get out of the vehicle, placed him in handcuffs, and escorted him back to his patrol vehicle. Thomas' driver side door was left open. Thomas asked the officer if he was being arrested. The officer explained he was not being arrested; rather, he was being detained for a traffic violation. The officer later described Thomas' demeanor as extremely nervous during this exchange. Another officer who had just arrived at the scene described Thomas as excited and angry as he was handcuffed, yelling at the officer.

After Thomas was escorted to the officer's vehicle and placed in the passenger seat, the officer briefed other police officers who had arrived on the scene regarding what had happened. At this point, a second officer spoke with Thomas, asking to search the center console of Thomas' vehicle for his driver's license. Thomas first gave his consent but then immediately retracted it. The officer who had stopped Thomas asked if there were any illegal items in the vehicle. Thomas replied there were none. The officer

3

verified Thomas was denying consent for officers to search his vehicle and called for the canine unit. As he waited for confirmation from the canine unit, the officer obtained Thomas' name and date of birth. He then provided this information over the radio for a license and warrant check.

The officer exited the vehicle and began speaking with the other police officers at the scene. During this conversation, the dispatcher confirmed Thomas' identity and stated he had an active warrant. The officer sought confirmation of the warrant. He told other officers at the scene he could write Thomas a citation for operating a vehicle without a driver's license. Other officers said he should not start writing any citations until he received confirmation of the warrant and, by that time, the canine unit would be at the scene. The officer continued to speak with other officers until the dispatcher confirmed there was an active warrant for Thomas, but it was non-extraditable.

After receiving this confirmation, the officer returned to his vehicle and began writing a citation for operating a vehicle without a driver's license. Meanwhile, the canine unit arrived on the scene. The officer stopped writing the citation, got out of his patrol vehicle, and briefed the canine unit officer. The canine unit officer then deployed his canine to do an air sniff of Thomas' vehicle. The canine alerted and jumped into the open door of the driver's seat as the officer finished writing the citation. Due to the alert, the officer searched the vehicle, finding in the center console a smoking glass pipe and a brown drip bottle with a clear substance inside of it. The officer also found a hypodermic needle with a red liquid substance in the pocket of the driver's side door. The drip bottle

4

and hypodermic needle later tested positive for methamphetamine. The officer completed writing the citation for operating a vehicle without a driver's license.

The state also charged Thomas with possession of a controlled substance under section 579.015 and unlawful possession of drug paraphernalia under section 579.074. Thomas filed a pretrial motion to suppress the evidence the officer found in his vehicle as the fruit of an illegal search in violation of the Fourth Amendment of the United States Constitution and article I, section 15 of the Missouri Constitution. The circuit court held a hearing at which the arresting officer and two other officers at the scene testified regarding the traffic stop, their detainment of Thomas, and the actions of the canine unit.

The circuit court overruled Thomas' motion to suppress, finding the officer did not wrongfully extend the traffic stop. The court reasoned any extension was caused by Thomas' uncooperative and argumentative actions, Thomas' search for his license, the officer's need to verify information regarding the outstanding warrant for Thomas, and the officer's need to gather information about Thomas to complete the traffic citation because Thomas was unable to provide his license. The court further found that, even if it was necessary to extend the detention, the officer had reasonable suspicion to detain Thomas while the canine unit completed the sniff due to the original officer's conversation with and observations of Thomas during the traffic stop. The circuit court found the discovery of the methamphetamine was not the result of an illegal search.

At a jury trial, the circuit court granted Thomas a standing objection to the admission of the evidence seized during the search based on his argument that the police unlawfully extended the stop and did not have reasonable suspicion for such an

5

extension. The jury found Thomas guilty of possession of a controlled substance and unlawful possession of drug paraphernalia, and the circuit court sentenced him to 10 years imprisonment for possession as a prior offender.

After decision by the court of appeals, this Court granted transfer. Mo. Const. art V, sec. 10.

## Standard of Review

"A [circuit] court's ruling on a motion to suppress will be reversed only if it is clearly erroneous." *State v. Barton*, 669 S.W.3d 661, 664 (Mo. banc 2023) (quotations omitted). This Court will hold a circuit court's decision clearly erroneous when there is a definite and firm impression that the circuit court made a mistake. *Id*. In reviewing the circuit court's record, this Court will defer to its factual findings and credibility determinations. *Id*. All evidence and reasonable inferences are reviewed in the light most favorable to the circuit court's ruling. *Id*. Whether the Fourth Amendment has been violated is an issue of law that is reviewed *de novo*. *Id*.

## Analysis

The issue to be decided in this case is whether the traffic stop violated Thomas' Fourth Amendment rights.[3] The Fourth Amendment guarantees individuals protection

---

[3] Thomas' point relied on also alleges violations of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, as well as violations of article I, sections 10, 15, and 18(a) of the Missouri Constitution. In his argument, however, Thomas does not discuss these rights or how they were violated. "An appellant is required to develop the issue[s] raised in its point relied on in the argument portion of the brief." *Smith v. Med Plus Healthcare*, 401 S.W.3d 573, 575-76 (Mo. App. 2013). Because Thomas failed to elaborate on these allegations, they are not preserved for appellate review. *State v. Edmond*, 675 S.W.3d 235, 243 (Mo. App. 2023).

from unreasonable searches and seizures. U.S. Const. amend. IV. A routine traffic stop is a reasonable seizure under the Fourth Amendment. *State v. Sund,* 215 S.W.3d 719, 723 (Mo. banc 2007). "[S]o long as the police are doing no more than they are legally permitted and objectively authorized to do, [the resulting stop or] arrest is constitutional." *State v. Barks*, 128 S.W.3d 513, 516 (Mo. banc 2004) (alterations in original) (quotations omitted).

In assessing whether an officer is objectively authorized to act in a particular manner during a traffic stop, a court looks to the purpose of the traffic stop, most often the underlying traffic violation. *State v. Granado*, 148 S.W.3d 309, 311 (Mo. banc 2004). The officer may detain an individual only for the time necessary to "conduct a reasonable investigation of the traffic violation." *Barks*, 128 S.W.3d at 516. When an officer prolongs the stop more than is reasonably necessary to complete the stop's purpose, the officer must have reasonable suspicion that a crime is afoot to detain the individual. *Granado*, 148 S.W.3d at 311. If the officer does not have reasonable suspicion when he extends the stop, the stop may become unlawful. *State v. Grayson*, 336 S.W.3d 138, 145-46 (Mo. banc 2011). Evidence obtained after the stop becomes unlawful is generally inadmissible under the exclusionary rule.[4] *State v. Norfolk*, 366 S.W.3d 528, 531 (Mo. banc 2012).

---

[4] The exclusionary rule renders inadmissible any evidence obtained in violation of the defendant's right against unreasonable searches and seizures. *Norfolk*, 366 S.W.3d at 531 (citing *Mapp v. Ohio*, 367 U.S. 643, 655 (1961)).

**The officer had reasonable suspicion that a crime was afoot,
allowing him to lawfully detain Thomas**

Thomas argues the officer unreasonably extended the traffic stop without reasonable suspicion to do so to allow the canine unit to arrive. Under the totality of the circumstances, the officer had reasonable suspicion there was additional criminal activity beyond the initial traffic violation, warranting the extension and canine sniff.

An officer can lawfully detain an individual beyond the time necessary to investigate the traffic violation "if the officer develops reasonable and articulable grounds for suspicion of illegal activity based on the behavior and responses of the individual during the traffic stop." *Id*. (quotations omitted). The totality of the circumstances is considered when evaluating whether the standard for reasonable suspicion has been met. *Id*. Whether an officer had reasonable suspicion is determined objectively through consideration of whether there was unusual conduct that reasonably led the officer to believe, in light of his experience, that criminal activity might have been afoot. *State v. Waldrup*, 331 S.W.3d 668, 673 (Mo. banc 2011). Actions that alone are consistent with innocent conduct, may, when considered together, amount to reasonable suspicion. *State v. Kempa*, 235 S.W.3d 54, 62 (Mo. App. 2007). Further, unless an officer has reasonable suspicion that criminal activity is afoot, the officer cannot prolong a traffic stop past the time reasonably necessary to complete the stop to conduct an unrelated canine search. *Rodriguez v. United States*, 575 U.S. 348, 357-58 (2015). But canine air sniffs are

constitutional, even if unrelated to the purpose of the search, when completed *during* the underlying traffic stop. *Illinois v. Caballes*, 543 U.S. 405, 409 (2005).

Based on Thomas's behavior and responses during the traffic stop, the officer developed a reasonable suspicion that criminal activity may have been afoot. After being pulled over, Thomas first rolled down his rear window. When asked to roll down his front window, Thomas rolled it down only a few inches. The officer testified this behavior was odd, as most people roll down their window fully when being pulled over, even when it is cold outside. When the officer asked Thomas for his driver's license, Thomas was unable to locate it but continued to shuffle through his wallet several times even though it was clear it was not present. When the officer conducted a pat-down search and felt a bulge, Thomas stated the object might be a "sharp," a term the officer understood to mean a hypodermic needle associated with drug use. After the officer gave Thomas permission to find his license in the center console, Thomas sat in the driver's seat and attempted to close the vehicle door between him and the officer. When the officer prevented him from doing so and told Thomas he had not given him permission to sit in the car, Thomas used his body to block the officer's vision of his hands as he reached into the center console. When the officer pulled Thomas out of the vehicle, Thomas lied, stating he had grabbed his driver's license. He was actually holding a debit or credit card he had showed the officer earlier during the stop. After the officer explained why he had pulled Thomas out of the vehicle, Thomas again lied, stating "I grabbed my ID." Throughout the exchange, Thomas was visibly nervous, speaking

9

quickly, and sweating even though it was a cold winter day.  Only after these events transpired did the officer call for the canine unit.

Although Thomas argues any one of these facts taken alone does not create reasonable suspicion, considered as a whole, these specific, articulable findings of facts, viewed in the light most favorable to the circuit court's ruling, demonstrate an objectively reasonable suspicion that criminal activity was afoot.  As the officer had reasonable suspicion that Thomas was engaged in criminal activity, he could lawfully detain Thomas to investigate that reasonable suspicion, summoning the canine unit and allowing the canine unit to conduct a sniff test.  The detention was swift, lasting less than 30 minutes from the beginning of the stop to the canine alert and subsequent search of the vehicle, and within the time necessary to investigate the officer's reasonable suspicion.  The circuit court did not clearly err in finding the officer had reasonable suspicion to detain Thomas and his acts did not violate the Fourth Amendment.

## Conclusion

The circuit court's judgment is affirmed.

_____

Mary R. Russell, Judge

All concur.

10